WM. H. ALLEN, Trustee for Mary Carmody, Appellee, v.
TRAVELERS PROTECTIVE ASSOCIATION OF AMERICA, Appel-
lant.

Accident Insurance: ACCIDENTAL DEATH: EVIDENCE. Evidence that an
insured died from a wound received in an affray with a burglar will
establish an accidental death and entitle his beneficiary to recover
upon a policy of accident insurance, unless liability for death from
such a cause is excepted by the terms of the policy.

Same: PRESUMPTION. Where it appears that death resulted from a
visible external injury, a presumption arises that it was not inten-
tionally inflicted, either by the insured or another person.

Same: BURDEN OF PROOF: INSTRUCTION. The presumption arising
from proof that a deceased met his death from an external cause
makes a *prima facie* case of accidental death; and where the de-
fendant in a suit on an accident policy, to meet this *prima facie*
showing, entered fully into the circumstances the instruction that
the burden was on defendant to show that the injury was not inten-
tionally inflicted was not misleading.

Same: AFFIRMATIVE DEFENSES: BURDEN OF PROOF. Where the general
provisions of an accident policy purport to insure against all acci-
dents, the insurer must plead affirmatively a provision of the con-
tract exempting it from liability, and it has the burden of proof
on that issue.

Same: INSTRUCTIONS: HARMLESS ERROR. Where the accidental charac-
ter of the injury to insured was conclusively shown, instructions to
the effect that such injury was presumptively accidental could not
be prejudicial although abstractly erroneous.

Evidence: ORDER OF INTRODUCTION: CROSS EXAMINATION: DISCRETION.
The introduction and order of evidence is largely a matter of dis-
cretion but usually large latitude is granted in the examination of
a party in interest. Where, however, the testimony in chief of the
wife of an insured, and beneficiary in an accident policy, was con-
fined strictly to the date of insured's injury and death, and to the

identification of her signature to an assignment of her cause of action to the plaintiff, refusal to permit her cross examination concerning the details of the circumstances attending the injury of deceased was not an abuse of discretion; and this is especially so where she was called on rebuttal and over objection testified fully in relation to those matters; the evidence being properly admissible on rebuttal.

**Same:** ADMISSIBILITY OF EVIDENCE. Where plaintiff introduced in
7  evidence certain allegations of defendant's answer, defendant was entitled to have all other allegations relating to the same subject received, but not the entire pleading.

**Accident Insurance:** INTENTIONAL INJURY: BURDEN OF PROOF: EVIDENCE.
8  An accident insurance company relying on the affirmative defense to an action on its policy, that the injury from which decedent died was intentionally inflicted by another and therefore it was not liable, has the burden of proof on that issue, and is not entitled to a directed verdict unless the defense is conclusively established. The circumstances in the instant case tend to show that the burglar who entered decedent's house and in a personal encounter mortally injured decedent may not have done so intentionally. The burden of proving the intent of the burglar in this respect was on defendant; and as such proof was necessarily circumstantial, and purely a matter of inference, the question of his intent was for the jury.

**Same:** CONSTRUCTION OF CONTRACT: LIABILITY. The constitution of
9  defendant association provided that in case a member should receive accidental injuries causing disability he should be paid a stated sum per week for one hundred and four weeks, and that an injury received in an attempt to rob should be considered an accident and the association should be liable for a weekly indemnity not exceeding ten weeks. By another provision the beneficiary of a deceased member whose death was accidental should receive the sum of $5,000. A rule of the association provided that it should not be liable for intentional injuries whether self inflicted or by another. *Held*, that the association was liable for the death of a member resulting from injuries inflicted by a third person in attempting to rob him.
DEEMER and LADD JJ., dissenting.

*Appeal from Linn District Court.*—Hon. MILO P. SMITH, Judge.

SATURDAY, OCTOBER 25, 1913.

ACTION upon a certificate of accident insurance issued by the defendant upon the life of John T. Carmody in favor of his wife, Mary E. Carmody, as beneficiary. The action is brought by a trustee for the beneficiary. For the purpose of our discussion, the beneficiary will be referred to as the plaintiff. There was a trial to a jury and a verdict and judgment for the plaintiff for the amount of the certificate, with interest. The defendant appeals.—*Affirmed.*

*Tourtellot & Donnelly* and *Sullivan & Sullivan,* for appellant.

*Dawley & Wheeler* and *A. T. Cooper,* for appellee.

EVANS, J.—The certificate in question provided for accident insurance only. It provided for the payment of $5,000 in case of the death of the insured by accident. The deceased died from a gunshot wound on August 7, 1909. Such wound was inflicted upon him on May 24, 1909. He received the wound while engaged in an encounter with a burglar in his home at about 1 o'clock in the morning. The following from appellant's brief is a sufficient preliminary statement of the circumstances attending the inflicting of the injury which resulted in the death of the insured:

That on the 7th day of August, 1909, John Thomas Carmody died by reason of injuries received at the hands of a burglar on the 24th day of May, 1909. That at the time of the injury Mr. Carmody was mayor of the city of Cedar Rapids. That on that date and about 1 to half past 1 in the morning a burglar entered the home on Fifth avenue and the sleeping room of Mr. and Mrs. Carmody. That the home of Mr. Carmody was a two-story dwelling, and he and Mrs. Carmody were sleeping in one of the upstairs rooms that had an opening into a hallway and a window leading onto a porch

on Fifth avenue. The bed in which they were sleeping was a little to the side of the door entering from the hall and was so that you could pass around the foot of the bed and upon either side of it. That about 1 o'clock on the morning of the 24th cries were heard from the Carmody home appealing for help and indicating that trouble was going on in the house. Those living in close proximity rushed across and found Mr. Carmody lying upon a sofa in one of the downstair rooms. That there was blood on his nightrobe over his stomach. Mrs. Carmody and her mother were in the room with Mr. Carmody at the time. Police arrived within a few moments and soon thereafter Dr. Rumhl. A bullet wound was found on Mr. Carmody that went just through the outer layer of the muscle of the stomach and lodged a little above the navel. Within a short time he was taken to the hospital and remained there until his death on the 7th day of August following. Mr. Carmody stated to Mrs. Zaleska, 'The coward got me here;' and he put his right hand over the end of the rib. There was a broken jardinière in the hall at the base of the stairway. Mrs. Carmody said she was in bed when the burglar came and as he came up to the bed she awoke and said 'Jack,' and the burglar said, 'Not another word at your peril.' That in the meantime Mr. Carmody got up and began scuffling with the burglar and Mrs. Carmody went out the window on top of the porch and screamed for help and in the meantime shooting took place. It is further shown by the undisputed testimony that quite a scuffle ensued in the bedroom while Mrs. Carmody was out on top of the porch calling for help. That Mr. Carmody grappled the burglar who was attempting to get to the stairway or Mr. Carmody was pushing him out into the hall, for it is shown that while in the hall at the head of the stairs a shot occurred, and two other shots took place within a short time thereafter as the burglar was either on the stairway or descending. Marks of the bullet were found on the wall. It is unquestioned the shots fired were from a revolver in the hands of the burglar. Mr. Carmody did not have in his hands a weapon of any kind.

The defendant is a mutual association and its contract is incorporated in its constitution and by-laws and in certain printed "rules" which were indorsed upon the back of the certificate of membership. Section 2 of article 9 of the con-

stitution provides as follows: "Sec. 2. $5,000 shall be paid to the beneficiary named in the certificate of any deceased member *in good standing* in case of death by accident." If full effect were given to this provision according to its terms, there could be no question as to plaintiff's right of recovery.

As modifying the quoted provision, the defendant pleaded certain "rules" of the defendant association which were indorsed upon the back of the certificate of membership. These rules are as follows:

That this association shall not be liable, in case of injuries, fatal or otherwise, inflicted by a member in good standing on himself while sane or insane, or injuries of which there are no visible mark upon the body (the body itself not being deemed such a mark in case of death), or in case of injury, disability or death happening to the member while in any degree under the influence of intoxicating liquors or narcotics, or by reason of and in consequence of the use thereof, or death or disability when caused wholly or in part by any bodily or mental infirmity or disease, dueling, fighting, wrestling, war or riot, injury causing death or disability resulting from an altercation or quarrel, voluntary overexertion (unless in a humane effort to save human life), voluntary or unnecessary exposure to danger or to obvious risk of injury, *or by intentional injuries causing death or disability inflicted by the member or any other person upon him;* injury causing death or disability received either while avoiding or resisting arrest, while violating the law or violating the ordinary rules of safety of transportation companies, or in case of injury fatal or otherwise, caused by disease of epilepsy, paralysis, apoplexy, sunstroke, freezing, fits, lumbago, vertigo or sleepwalking, voluntary or involuntary conscious or unconscious inhalation of any gas or vapor, injury fatal or otherwise, resulting from any poison or infection or the result of an insect bite or sting, or from anything accidentally or otherwise taken, administered, absorbed or inhaled, disease, death or disability resulting from medical or surgical treatment; operation made necessary by the particular injury for which claim is made and occurring within six calendar months from date of accident excepted.

The particular "rule" upon which defendant relied is indicated in the foregoing quotation by italics. The contention was that the injury which caused the death of the insured was *intentionally* inflicted upon him by the burglar and that the defendant was therefore not liable.

In instructing the jury, the trial court laid upon the defendant the burden of proving that the injury in question was intentionally inflicted by the burglar. It also instructed the jury that a presumption would obtain that the injury was not intentionally inflicted unless it was otherwise made to appear from all the evidence in the case. The principal assignments of error concentrate upon the proposition here involved.

I. Appellant's first complaint is that the trial court erred in its instructions in putting upon the defendant the burden of proving that the injury in question was intentionally inflicted by the burglar.

It appears conclusively from the evidence on both sides that the injury was not inflicted by Carmody himself. The injury therefore was accidental as to Carmody, even though it were intentional on the part of the burglar. This is the uniform holding of the authorities. *Jones v. U. S. Mutual,* 92 Iowa, 652; *Hutchcraft v. Insurance Company,* 87 Ky. 300 (8 S. W. 570, 12 Am. St. Rep. 484); *Button v. Association,* 92 Wis. 83 (65 N. W. 861, 53 Am. St. Rep. 900).

1. ACCIDENT INSURANCE: accidental death: evidence.

If we could ignore the exceptions enumerated in the "rules" as above quoted, there could be no doubt of the plaintiff's right of recovery as for death resulting from accidental injury. *Jones v. U. S. Mutual, supra.* If the plaintiff must fail, it is not because she has failed to show that the death resulted from accident but because by the terms of the insurance contract such accident was excepted from its operation. Under the "rules," not *all* accidental injuries are insured against. The exceptions are enumerated. These exceptions relate mainly, not to the nature or form of particular injuries, but to the immediate circumstances attending the infliction of

the injury. For instance, accidental injuries occurring while the insured is under the influence of intoxicating liquors or while wrestling are excepted from the operation of the policy. In such a case it would not be necessary for the defendant to deny the accidental character of the injuries. It would be a sufficient defense to show that they occurred under circumstances excepted by the policy. So in the case before us. Even though the injury was accidental as to the insured, yet, if it was intentionally inflicted by the burglar, it was excepted from the operation of the policy, and the trial court so instructed the jury. Was the burden properly laid upon the defendant to show that the injury in question was intentionally inflicted?

We have heretofore held that, where death is shown to have resulted from an external and visible injury, a presumption will obtain that it was not intentionally 2. SAME: inflicted either by the insured or by another presumption. person. *Caldwell v. Association,* 156 Iowa 327; *Taylor v. Association,* 110 Iowa, 621; *Carnes v. Association,* 106 Iowa, 281; *Jones v. U. S. Mutual Association,* 92 Iowa, 652.

It is perhaps inaccurate in a verbal sense to say that the burden of proving any fact rests upon the defendant unless such alleged fact is a part of his affirmative defense. If a presumption obtains in favor of plaintiff, he 3. SAME: burden may support it with additional evidence if he of proof: instruction. can or he may take the risk of resting upon his *prima facie* case. A *prima facie* case is not necessarily a strong case, and it may be lost before a jury. The presumption in plaintiff's favor is one of fact and is not conclusive as a matter of law. He is entitled to the benefit of it in so far as it is not overcome by the other evidence in the case. It matters not whether such other evidence comes from one side or from the other. In this case the plaintiff made a *prima facie* case and rested without introducing any evidence of the immediate circumstances of the infliction of the injury. The defendant properly entered fully into such circumstances with its evidence. Looking at the question, therefore, in a negative and

defensive sense alone, it was not misleading to say that the burden was on the defendant to show that the injury was intentionally inflicted.

But the defendant in this case pleaded this provision of the "rules" as a separate and affirmative defense. If this provision was properly pleaded as an affirmative defense, necessarily the burden of proving it rested upon the pleader.

There is the further consideration that the proviso pleaded was in the nature of an exception to the general provisions of the constitution which purported on their face to cover *all* accident insurance. It devolved upon the defendant to plead and to prove that the accidental injury, from which the insured died, came within such exception. If it devolved upon the plaintiff in the first instance to traverse such exception and to prove the negative, it would likewise devolve upon her to do the same as to the entire enumeration contained in the "rules" above quoted. We think, therefore, that the proviso under consideration should be deemed as in the nature of an exception and that the general rule of pleading and proof in such cases should obtain. This was our holding in *Payne v. Frat. Accident Ass'n,* 119 Iowa, 342, and *Jones v. U. S. Mutual Ins. Co., supra.*

4. SAME: affirmative defenses: burden of proof.

The fact that the accidental character of the injury as to Carmody is conclusively shown, from the evidence on both sides, renders it unnecessary that we consider the instructions of the court to the effect that such injury was *presumptively* accidental. Such instructions could not be prejudicial to defendant, upon this record, even if they were abstractly erroneous.

5. SAME: instructions: harmless error.

II. Complaint is made by appellant because it was not permitted to cross-examine the witness, Mary Carmody, the beneficiary, to the extent desired. The attempted cross-examination is set forth fully in the record. We need not include it here. There was some technical maneuvering on the part of counsel on each side in an effort to avoid assuming a greater burden of proof than was legally necessary. The de-

6. EVIDENCE: order of introduction: cross-examination: discretion.

fendant's answer pleaded a general denial and certain separate affirmative defenses. Mary Carmody was sworn as a witness for the plaintiff. Her testimony in chief was confined strictly to a statement of the date of the injury of her husband and the date of his death and to the identification of her signature transferring her cause of action to the plaintiff trustee. Thereupon, by a series of questions on cross-examination, the defendant attempted to inquire into the details of circumstances of the night of May 24th. Objection was made to such line of examination as not proper cross-examination, and the objection was sustained. The ruling was strictly proper. It is true, as contended, that courts will usually allow large latitude to the cross-examination of a party in interest. But this also is discretionary with the trial court. This witness was placed upon the stand again on rebuttal by plaintiff, and the whole subject was fully covered, and full opportunity for cross-examination was given. Objection, however, was made by defendant to all such examination as not proper rebuttal, and complaint is now made of the adverse ruling of the trial court on such objections. It is impossible for defendant to maintain its grievance at both ends. In the presence of the later opportunity for cross-examination, it is not in a position to complain of being deprived of such opportunity in the first instance. We think that such evidence was properly admitted in rebuttal. In any event, such question is so largely a matter of discretion with the trial court that only an abuse of discretion would justify interference on our part.

III. For the purpose of proving her case as against the general denial, the plaintiff introduced in evidence certain allegations contained in some of the affirmative defenses pleaded by the defendant. Thereupon, as in the nature of a cross-examination, the defendant offered in evidence its whole pleading, and this was objected to by the plaintiff, and the objection was sustained. Defendant's contention is that, inasmuch as the plaintiff had introduced in evidence a part of its answer, it

7. SAME: admissibility of evidence.

was entitled to introduce the whole. It was entitled to introduce so much of its answer as related to the same subject. Code, section 4615. The defendant's offer was unrestricted and included matter clearly inadmissible. It was therefore properly rejected.

IV.  It is urged by appellant that a verdict should have been directed in its favor on the evidence as a whole on the ground that it conclusively appeared that the injury from

8. ACCIDENT IN-
SURANCE: in-
tentional in-
jury: burden
of proof: evi-
dence.

which Carmody died was intentionally inflicted by the burglar. On first impression it would seem uncandid to say that the victim of a burglary, shot by the burglar in an encounter, was not intentionally injured; and yet we think it must be said upon this whole record that circumstances are made to appear which fairly tend to show an intent to avoid personal injury on the part of the burglar. The theory of the plaintiff is that he shot only to frighten Carmody and to make his escape. The evidence would warrant a finding that, after the shot which took effect, he shot twice over the head of Carmody when he was within a few feet of him, backing downstairs, and when he could not have failed to inflict further injury upon him if he had tried to do so. In this respect, the case is quite as strong for the plaintiff as was the case of *Jones v. U. S. Mutual Association, supra.* It is much stronger than the case of *Railway Accident Association v. Drummond,* 56 Neb. 235 (76 N. W. 562.) The defendant's defense rested at this point wholly upon the question of the *intent* of the burglar. Such intent could be ascertained only by inference from the circumstances shown. The question of intent is usually and peculiarly a jury question. Even the legal presumptions which might obtain as against the burglar would not necessarily obtain against Carmody or the beneficiary of his insurance. If the burden of proof were on the plaintiff as to such intent, a different question would be presented at this point. Inasmuch as the burden was upon the defendant, a verdict could not be directed in its favor

without holding that it had proved the intent affirmatively
and conclusively.  It is the exceptional case where the court
can properly direct a verdict in favor of the party having
the burden of proof.  And this is especially so where a vital
fact is sought to be established only by inference from at-
tending circumstances.  We think that the intent was not
proved so conclusively as to entitle the defendant to a di-
rected verdict upon the affirmative proposition.

Appellant's brief brings before us a number of cases
wherein the same form of policy was involved and wherein
it was held that recovery could not be had if the injury was
intentionally inflicted by a third person.  Special reliance
is placed upon the case of *Butero v. Travelers' Accident Ins.
Co.*, 96 Wis. 536 (71 N. W. 811, 65 Am. St. Rep. 61).  In
that case the Supreme Court of Wisconsin considered the
evidence and held it to be sufficiently strong in its showing
of intentional killing to warrant the granting of a new
trial and such new trial was ordered.  Although the Wiscon-
sin court did not order a dismissal of the plaintiff's case, it
did discuss the evidence, and it appeared to hold that the
evidence was conclusive in favor of the defendant.  The very
discussion of the evidence contained in that opinion im-
presses us as presenting a question for the jury within the
rule that has heretofore been followed in this state.  It is
to be noted also that in such opinion it is assumed (though
without discussion) that, if the killing was the intentional
act of an assassin, it was not accidental within the meaning
of the policy.  Such an assumption leaves the burden of
proof upon the plaintiff.  A directed verdict in such case
for the defendant presents less difficulty than if the burden
of the affirmative rested upon it.  We are constrained also
to say at this point that there is another provision of the
insurance certificate which should not pass unnoticed and
we set it forth in the next division hereof.

V.  Section 3 of article 9 of the Constitution provides
as follows: "Sec. 3.  Whenever a member of this associa-

tion in good standing shall, through external and accidental
means, receive bodily injuries which shall, in-
dependently of all other causes, immediately
and wholly disable him from transacting any
and every kind of business pertaining to his occupation as
shown by the records of this association, he shall be paid
for the loss of time occasioned thereby the sum of $25 per
week, not exceeding one hundred and four consecutive weeks.
Provided, *that an injury received by a member in an attempt
to rob said member—proof of intent to rob to be established
by claimant—shall be considered an accident* and the asso-
ciation shall be liable for weekly indemnity only, not ex-
ceeding ten consecutive weeks, as in the case of accidental
injury received in any other manner.'' We have italicized
the particular provision to which attention is directed. In
the case before us it is undisputed that Carmody was shot
during an attempt to rob him. The proviso from the ''rules''
relied on as a defense appears on its face to be inconsistent
with the proviso of the constitution here quoted, if it is to
be applied to an injury received during an attempted rob-
bery of the assured. It is true that section 3 deals with in-
juries which result in disabilities only and not in death.
But the proviso from the ''rules'' applies on its face to
injuries causing ''death or *disability*'' inflicted by the mem-
ber or any other person upon him. To render these two
provisions harmonious, we would have to say that the pro-
viso of the ''rules'' is not intended to apply to an injury
inflicted upon the assured during an attempt to rob him.
The constitution itself has singled out that specific class of
circumstances and has declared that an injury so received
''shall be considered an accident.'' This dispenses with the
necessity of proof of intent or want of intent to inflict the
injury, provided only that intent to rob is proved.

It is true that this section of the constitution limits the
liability of the defendant for resulting *disability* to a weekly
indemnity of ten weeks and that it has not assumed to deal

*9. SAME: con-
struction of
contract:
liability.*

with the question of liability in case of death. But the importance of the provision to this case is that it renders the proviso of the rules relied on as a defense nonapplicable to a case of robbery. If the two provisos should be deemed conflicting, then a construction should be adopted most favorable to the assured. If Carmody had survived his injuries, it is clear that he could have recovered for his disability and he could have so recovered as for *accidental* injuries upon proof that they were received in an attempt by the burglar to rob him. The attempt to rob is undisputed. In such case the injury "shall be deemed an accident." Carmody did live for about ten weeks after the accident. During that period of time he was deemed under the terms of his policy to have received his injuries by accident. Did his subsequent resulting death change the accidental character of the original injury? It cannot be. The most that could be claimed here would be that, by the terms of the insurance certificate, his resulting death from this particular accident deprived him of all right of recovery for such accident. In other words, that as to such accident he was insured against *disability* only and not against *death*. This construction would be in direct contradiction to the other provisions of the insurance certificate, notably so to section 2, heretofore quoted. The important thing as to section 3 now under consideration is that it defines the kind of injury involved in this case as an "accident" and specially provides that it "shall be deemed an accident." It purports to insure against the same to some extent at least. This necessarily takes it out of the enumeration of exceptions which we have heretofore quoted. These exceptions make no distinction between death and disability, so far as the nature of the liability is concerned. Neither does any distinction appear as to the nature of such liability in any other part of the insurance certificate unless it be found in section 3 here set forth. This section purports to deal with the *extent* of liability for *disability* only. It does not in terms qualify section 2 to any

extent. If the various provisos of the contract are conflicting or inconsistent, then of course they should be construed most favorably to the assured. We think the contract in this case can fairly be construed as insuring against accident received by the victim of an attempted robbery in the course of such attempt; that the intentional infliction of injury by a robber in such a case is reserved from the enumeration of exceptions which are set forth in the rules; that section 3 limits the extent of the recovery for *disability* only; and that it does not qualify section 2 which fixes the amount of recovery in case of death at $5,000.

To construe the insurance contract otherwise would render it naturally misleading to the assured. Under this construction the plaintiff would have been entitled to a directed verdict under the undisputed evidence and concessions in the case. Plaintiff, however, did not base her claim of recovery on this ground. But, if we should otherwise feel compelled to award new trial because of errors presented, we should deem it our duty to take notice of these provisions of the contract in support of the judgment already obtained. The injury involved is clearly within the fair scope and spirit of accident insurance. The enumeration of exceptions on the back of the certificate is sufficiently voluminous, and we ought not to add to such exceptions by unnecessary construction.

The defendant suffered no prejudicial error in the court below, and the judgment is therefore *Affirmed*.

WEAVER, C. J., and GAYNOR, PRESTON, and WITHROW, JJ., concur.

DEEMER, J. (dissenting).—So much depends upon the facts disclosed by the record with reference to the manner of Carmody's death that I here reproduce the uncontradicted and undisputed testimony with reference thereto. Testimony was adduced without objection as to declarations made by

deceased just after the shooting. This came from several witnesses, and there is no substantial difference between them as to what was said. This testimony was part of the *res gestæ* and was admissible as substantive testimony. One witness gave the following testimony as to what Carmody said:

Q. Did you have any conversation with him at that time as to how the injury occurred, if so, state what? A. I had hold of his hand; I said, knowing him as I did, I said, 'John, wasn't there anything that you could get hold of that you could beat him up with?' He said, 'No, Billy, if there was I could have beat him to death, I know.' Made the remark if he could even got a slipper or anything that he might have battered his head or something of that kind. Q. Did he say where the shooting occurred or anything about that, where they struggled? A. Well, I don't know, of course I know we talked on that line; it was in the house, of course, from one room to the other. Q. Did he say anything about how many times the burglar shot at him? A. I think he made the remark about two or three shots anyhow. (On cross-examination plaintiff's counsel insisted on making the following record): I had been a police officer for twenty-five years and have had experience in the investigation of burglars. Q. Became acquainted with their ordinary ways and manner of carrying on their business from observation and investigations that you have made? A. I have made some of those investigations, yes. Q. Isn't it a very usual and ordinary thing with those burglars, not robbers, to carry a pistol for the sake of bluffing and intimidation? (Objected to as incompetent, irrelevant, and immaterial and as calling for the conclusion and opinion of the witness. Overruled; defendant excepts.) A. I don't know about their bluffing anything of that kind; I think they are there to do business. Q. Isn't that a common thing for them to be making threats of what they will do without any intention of carrying that out? A. I never came in contact with one of them making those threats. (On redirect examination the witness said): I know it is a matter of common custom that, when a man breaks into a house and is pressed to the wall, the common custom among burglars is to shoot rather than be caught. My impression they are there for business.

The most satisfactory evidence regarding these declarations was from a police officer, named Christensen, who gave the following testimony:

Q. What was 'the first that you knew of any difficulty happening at the Carmody home on the night that he was shot? A. I heard the shot. I was on Fifth avenue and Sixth street on the south side of Fifth avenue and the east side of Sixth street. I should judge one hundred and fifty to one hundred and seventy-five feet from the Carmody home. The first shot I could not locate. Within four or five seconds there was another shot and I located that one. Officer Graham was with me at the time. We started to run down there as fast as we could. It could not have been over five minutes after the shot when we arrived there. Q. In the neighborhood of half a minute or so you was there? A. Yes, not very long anyhow. I went to the front door and told Officer Graham to go around to the back door. I went up to the front door and it was locked and I couldn't get in. I rapped at the door. Mrs. Carmody was up on this porch hollering, 'Help,' and I stepped back and called to open the door and then went back to the door again, and I think Mrs. Buckingham opened the door. When I got inside in the hall I flashed my light and Mrs. Buckingham and Mr. Carmody was there. It was dark in the front part of the house. There was a curtain drawn between what I call the parlor and the sitting room and the hall. I went right through the house flashing my light and went to the back door. In the dining room there was a light; what I call the dining room; it is the room back of the kitchen. I went to the back door to see if the door was locked and it was bolted on the inside so I knew that he couldn't have gone that way. Mr. Carmody following me back to the back door or right close to me. I came back again and Officer was on the outside and he said, 'Sam, I believe here is where he got out.' The window was open on the west side of the house and of course we turned the lights on. Chief Cook was there at the time. He came right in behind me and I turned around and I saw Mr. Carmody was hurt, and I asked him, 'Are you hurt, John?' He said, 'Yes, I believe I am.' I said, 'How bad?' and he said, 'Pretty bad, I have an awful pain.' About that time he was ready to fall and I took him in my arms and I think Chief Cook was there at that time. Cook

was the fire chief; he is dead now. I laid him on the couch in what I would call the library. After I got him down on the couch, I opened up the nightdress and I could see the hole right in his stomach; it looked like a bullet hole. Q. Where was Mr. Carmody when you first got in the house? A. In the hall. He and her mother were there; he was pretty excited. Q. What did he say? A. He said, 'The damn, dirty coward, I wish I had of got hold of him;' he says, 'The damn coward, he even slapped my wife.' Q. Did he say where the fellow got him? A. Yes, he said the burglar got him; the fellow that was in the house. Q. Did he tell you anything about where the struggle occurred? A. Yes, he said that his wife awakened him and there was a man in the house and he started after him and got hold of him and he got out on the outside of the door and he got away from him, and he said he still started after him and then is when he shot at him. Q. Did he say whether or not he had held the burglar, that he had hold of the burglar, when the burglar shot him? A. No, he didn't have hold of him at the time. Q. The burglar was away from him when he shot? A. Yes, that is what I understood him to say. Q. He said the shooting occurred outside the bedroom? A. Yes, sir. Q. In the house did you see any evidence of any struggle having occurred? A. There was some crockery laying broken in the hall at the foot of the stairs. Mrs. Carmody was upstairs when I first got there and was screaming for help. Q. And when you first saw John, what did he say about a man; how did you happen to run through the hall? A. I asked John, 'Is he still in the house?' and he says, 'I believe he is.' That is the reason I went through the house looking for him. There was a light in the dining room; the only light in the house. I flashed my light and that is when I first saw Mrs. Carmody. When we laid Mr. Carmody on the couch I told somebody to tell Mrs. Carmody that John was hurt pretty bad. My first conversation with Mrs. Carmody was after Mr. Carmody was taken to the hospital. Q. You may relate what Mrs. Carmody said to you about how the accident occurred. A. She said the first thing when she woke up she thought she heard some one in the room, and then she seen somebody standing by the bed. He had a little flash light and he threw that in her face, and she began to raise up and he said, 'Lay down at your peril;' and about that time John wakened up and of course they started. It

seems as though John was on this side of the bed. Anyway John got around there and they scuffled and finally got out on the outside of the room and she started for the front window. There was a screen in the window she said and she had to take that out, but I guess it wasn't long, and she raised the window up and got out on the porch. Q. You say that she said John was on the outside of the bed, the west side of the bed? A. Yes, away from the door. Q. He got around on her side? A. He was standing at the foot of the bed as near as she knew. Q. What did she say he said to John? A. He said, 'Lay still or I'll kill you.' Q. What did John say to that? . . . Q. She said he got up when the burglar told him to lay still or he would kill him? A. Yes, and that is when John got out of bed. She heard the shots afterwards, she said. Don't think she said anything about scuffling, not as I could hear anything. I was busy telephoning for the doctor. She said the shots occurred out in the hall after she got outside of the bed and door. I did not see any revolver on the floor around there; no gun of any kind. Q. Did Mrs. Carmody say anything to you about John having a gun or anything of that kind? A. She said he never had a gun in the house.

Other witnesses for the defendant gave substantially the same testimony. Mrs. Carmody, who was a witness for plaintiff in rebuttal, did not dispute any part of the testimony, save that she said:

A. I was asleep and Mr. Carmody was asleep. Something awakened me. I don't know what; my impression is that it was the presence of some one in the room. I raised up and listened and I heard some one on his side of the bed where his clothes were; that is, the west side of the bed. I reached out my hand and put it on him and says, 'Jack! Jack! Some one is in the room.' Just then a flash light was turned on me, on my eyes instantly, and then it was flashed into Mr. Carmody's eyes and then back and forth right close to my eyes and his, and then I raised up and some one struck me a blow here and said, 'Lay quiet at your peril.' Then it seemed as though Mr. Carmody was undertaking to get up and as though he was thrown back on the bed again, because it

sounded that way to me. I lay quiet a few minutes, and then the light was turned in my eyes again and then I raised up and he struck me across the face again and broke my gums across the lower teeth and then I lay quiet a little bit and they had come in a clutch and I could hear the heavy breathing; then everything grew dark on my side and everything was quiet; and then I raised up again and I felt his breath on my face and he leaned down and said, 'Keep quiet or I'll kill you,' and struck me a blow there and it afterwards got as black as my dress. Then I lay down and they were still struggling. I lay there a few minutes, crept down under the bed clothing to the foot of the bed, and got out and ran across the room and tried to get the screen out. I had to unfasten it and throw it out on the roof and I got out on the roof and ran to the north next to Mr. Cook's house and I called for help. When I called for help I was on the north veranda. I called for Mr. Cook and I saw the lights turned on in the room and he came out of the house instantly. Mr. Tourtellot: Let this same objection apply to all this testimony along this line. The Court: All right. (The defendant excepts.) Mr. Cook was the fire chief and lived next door on the west. He was prepared to come out on short notice. I screamed to him to come quick and he turned around and went back into his house, and I turned and ran just as fast as I could to the other end, and that brought me to the window where I had gotten out, and I called there for help and then commenced screaming everything, and then I heard the report of a revolver in the house. Q. Just where were you when you heard the report of the revolver in the house? A. I was directly in front of the window. I was directly in front of the north window. There are three windows in front of the house. The Court: Were you still on the top of the porch? A. Yes, sir. Q. Now, from the shot and the noise inside, could you tell just about where Mr. Carmody and the burglar were when this shot occurred? A. I should suppose my husband was right in the door, leading from the room into the hall. Q. Could you tell somewhere about where they were when this shot occurred from the noise or sound? A. Yes. Q. You could make some approximation of about where they were from the sound you heard, about where did this sound appear to come of that shot? A. It was leading into the hall. I ran and got in the window and ran across the floor

to this hall and went out and took hold of my husband, who was standing at the head of the landing, the upper landing. The burglar was down by the window. Mr. Carmody was at the top; that would be near the bedroom door. He was standing just about the middle about a foot from the top of the stairs. I took hold of his nightshirt and held onto it and stayed at his back. The burglar was going down stairs pretty fast. He went swiftly and when he got to the window there on the last step leading to the second landing looking up from the top steps he fired a shot and it whizzed past us. We both stood there and then he went swiftly backwards down about three steps from where that jardinière stood and then fired up again and that just grazed me here between Mr. Carmody's back and my breast. He was either two or three steps from the bottom. I saw him plainly when he was on this last step that he fired that last shot because the flash of the gun came and I saw he was tall and slim. He then backed down swiftly and he knocked this large jardinière off with the large plant in, and it made a dreadful crash. . . . Q. Now, was there enough light so that you saw this burglar when you first came out and found your husband in the hall at the top of the stairs, could you see the burglar going down? A. I could see the figure, but when he got down on this last place that he shot then the flash from the gun and with that light that came in I could see. The jardinière stood on a small post about four or five feet high. Q. Now, when this burglar fired the shot that he fired, the first one after you got in the hallway, were you and Mr. Carmody still standing in the hall at the top of the stairs? A. Yes, sir. Q. You saw the burglar going down stairs? A. Yes, sir. Q. Then he turned and shot back upstairs, did he? A. He didn't turn, he went backwards all the way down. This bullet did not hit either Mr. Carmody or myself; it went in the west wall of the hallway. Q. Was anything more seen of this burglar after he fired this last shot near the bottom of the stairs? A. I can't say; I did not see him. The burglar did not say to Mr. Carmody 'Lie still at your peril or I will kill you.'

On cross-examination the witness said:

. . . I heard a noise on my husband's side of the bed. The noise was the first thing I heard when I wakened

my husband. I said, 'Jack, there is some one in the room.' He said nothing. Just instantly a light was thrown in my eyes and the man struck me there and threw his light on us both right down close. Q. Then he flashed the light in your eyes and your husband's eyes and said, 'Move at your peril'? A. He stooped down. When he struck me I cried out, and he stooped down, I could feel his breath, and said, 'Keep still at your peril.' Q. So he was more afraid of you than of Mr. Carmody? A. It seems that way because instantly I awoke my husband, after he turned the light off our eyes, they commenced. He leaned down on my right side and he struck me on my left side. I cannot say what it was; it was a hard substance. Q. The struggle wasn't going on until your husband got out of bed? A. No, but I rather think when my husband undertook to raise up he struck him; the bed seemed to take a terrible jar. I don't know whether when he tried to get up was when he threw him back or not. Q. When your husband was struck and during the time this man and your husband were struggling in the room, John T. Carmody didn't utter a word? A. No, sir; not in that room. . . . Q. When you heard a gunshot you gave a scream and went back in the room? A. Yes, immediately. Q. When you got out in the hall your husband was standing, you testified, about a foot from the top of the stairs? A. Yes, sir. A burglar then was disappearing down the stairs; I saw his shadow; then he turned and shot on the halfway landing. He went backward all the way down, keeping watch of my husband and myself. Q. When he was about one or two steps from the halfway landing he fired a second shot? A. It might have been three steps; it was near the second landing. Q. Then when he got nearly down he turned and fired the shot that made the dent in the tapestry? A. He didn't turn, because he had his back already the other way. Q. You don't know what occurred between the man on John's side of the bed and John except the sound of the struggle you overheard? A. Yes, the heavy breathing and heard that chair upset when I was coming back on top of the porch. Q. Where was the chair upset? A. On the west side of the bed. Q. When did you see that? A. When they turned the lights on; I turned them on myself. Q. And that was after the shot was fired? A. Yes, I turned the lights on to get my gown, after the burglar escaped from the house.

The only substantial difference between Mrs. Carmody's testimony and that of the other witness seems to be that, upon her examination on the witness stand, she stated that the burglar did not say to Mr. Carmody, "Lie still at your peril, or I will kill you." Although various other witnesses testified that, in giving an account of the transaction immediately after it occurred, she did say that this was what the burglar said to both Mr. and Mrs. Carmody or Mr. Carmody himself. In the face of this record and without regard to certain procedural matters as the burden of the evidence, the burden of proof, presumptions, etc., which are established simply to arrive at the truth in each and every case, I cannot, much as I would like to do so, agree with an opinion holding that the killing of Carmody was an accident or that any jury uninfluenced by sympathy, passion, or prejudice would be justified in so holding. I do not know how a clearer case of murder could be made out. Carmody said that the burglar "shot at him," that "he got him," etc., and the testimony to my mind clearly establishes that fact. In law every one is presumed to have intended that which the testimony shows he did in fact do. The burglar shot and killed Carmody, and the presumption would be, in the absence of any testimony as to motive, that he did so intentionally. Carmody said that he shot at him, and the shot was evidently fired after he had gotten away from Carmody and while Carmody was pursuing him. To say that it might have been an accident is too much of a stretch on human credulity.

The defendant company is not liable if the shot was fired intentionally by a burglar or any third person. It had the right to so contract, and courts are not justified in disregarding a perfectly valid provision of the policy. Again, if the first shot was accidental and the burglar had escaped from Carmody knowing, as he must have known from the circumstances, that Carmody was not armed, why did he fire the second and third shots? It was so dark that he could easily escape as the avenues were open and he was upon the

stairway going down into the hall. That he did not fire these shots merely to intimidate is clear from Mrs. Carmody's testimony. She said that they passed very close to herself and husband, while they were at the head of the stairs, and she evidently thought they were intended to kill. Their course and direction, as indicated by the witness, leaves no doubt in my mind that they were so fired. One thing is clear from the record, and that is they were not fired accidentally in a scuffle but after the burglar had gotten clear from his assailant. Carmody did not believe they were accidental for he said the burglar shot at him.

The case is so much like one from the Wisconsin court, *Butero v. Travelers' Insurance Co.*, 96 Wis. 536 (71 N. W. 811, 65 Am. St. Rep. 61), that I cannot forbear quoting therefrom. After quoting the following instruction: ''That the burden was on the defendant to satisfy them to a reasonable certainty, and by a preponderance of the evidence, that the insured met his death through intentional violence inflicted upon him by some person or persons unknown. That the presumption of murder does not arise from the mere fact of external marks of violence upon the body of the deceased, as testified to, but 'you must be satisfied from all the evidence, in order to find for the defendant: First, that the insured met his death through bodily injuries inflicted at the hands of some person or persons unknown; second, that at the time such person or persons inflicted such injuries he or they intended to so inflict them upon the body of the said Joseph Butero (that is, that he or they knew, at the time he or they inflicted such injuries, that he or they inflicted them upon the body of the said Joseph Butero); and if you are satisfied from all the evidence that the person or persons inflicting such bodily injuries knew that he or they were inflicting them upon the body of the said Butero and intended to so inflict them, then you will find for the defendant, otherwise for the plaintiff' ''—the court said through Pinney, J.:

The contract upon which the action is founded is that the insurance provided by it 'does not cover accident or death, resulting wholly or partly, directly or indirectly, from . . . intentional injuries, inflicted by the insured or any other person.' In view of the facts in evidence, and about which there is really no dispute, the question is whether the legal presumption invoked by the plaintiff that the injuries the deceased received were accidental or unintentional is not wholly repelled or overborne by the evidence. The presumption in question properly applies where there is no evidence to show the circumstances and manner in which the injuries were inflicted. The defendant is not liable if the injuries which caused the death of the insured were intentionally inflicted by himself or any other person. While this is a defense, and the burden of proof is ordinarily upon the defendant, yet if it appears upon plaintiff's evidence, or upon the entire case, that such injuries were intentionally inflicted, the legal presumption is overthrown. The defense may be established by facts and circumstances, and the inferences properly to be drawn from them, sufficient to satisfy the jury of the truth of the defense with reasonable certainty. It is beyond question or dispute that the insured came to his death by external and violent means. The legal presumption is that his death was not caused by his own suicidal act. The evidence clearly shows that the external and violent means of his death proceeded from some person unknown. The inquiry is as to the question whether the shooting that caused his death was accidental or intentional and with the design of effecting his death; and this question is to be determined from the facts proved, the manner of his death, and all the attending circumstances. If the killing was accidental as to the insured in that he anticipated or expected no injury but intentional as to his assassin, then, according to the plain language of the provision of the policy, there can be no recovery. *Insurance Co. v. McConkey,* 127 U. S. 661-667 (8 Sup. Ct. 1360 [32 L. Ed. 308]); *Mallory v. Insurance Co.,* 47 N. Y. 52 (7 Am. Rep. 410). The case of *Button v. Association,* 92 Wis. 83 (65 N. W. 861 [53 Am. St. Rep. 900]), was upon a provision materially differing from the one in question, and this case is therefore not in point. It is necessary only that the evidence of intentional killing preponderate against the presumption of accident. *Cronkhite v. Insurance Co.,* 75 Wis. 119 (43 N. W.

731 [17 Am. St. Rep. 184]); *Johns v. Association,* 90 Wis. 335 (63 N. W. 276, 41 L. R. A. 587); *Bachmeyer v. Association,* 87 Wis. 337, 338 (58 N. W. 399). The plaintiff's counsel relies upon *Hutchcraft v. Insurance Co.,* 87 Ky. 300 (8 S. W. 570, 12 Am. St. Rep. 484), in which it was held that one assassinated comes to his death by accidental means; but in that case there was not, as there is in this, a provision to the effect that the policy of insurance did 'not cover accident nor death resulting wholly or partly, directly or indirectly, from . . . intentional injury inflicted by the insured or any other person,' and it is not in point. Nor is *Accident Co. v. Carson,* 99 Ky. 441 (36 S. W. 169, 34 L. R. A. 301, 59 Am. St. Rep. 473) which did not contain the same or a similar provision. The same is true of *Insurance Co. v. Bennett,* 90 Tenn. 256 (16 S. W. 723, 25 Am. St. Rep. 685). The killing was clearly the result of intelligent human agency. Was it accidental or intentional? The assured went, at 6 o'clock in the afternoon, from his supper table to his employment as a coal heaver in the coal shed, where he was to spend the night with his companion in hoisting coal. The night was a very dark one. It thundered and lightened and rained, particularly at the time he received the fatal shots. They worked continuously until about 11 o'clock, with their backs towards the railway track, upon which the coal shed opened, with two lighted lamps near them and with the upright hoist between them, operated by cranks, one working on either side. When they had partly raised a bucket of coal, and, so far as it appears, when they were utterly unaware of the presence of any human being, they were startled by a pistol shot, which sent a bullet crashing through the brain of the insured, and he fell dead where he had stood; and two other shots, either of which would have proved fatal, were fired in rapid succession into vital parts of his body. His companion, Dominique, instantly fled and ran about a block to the station. He had seen no one about there during the evening and had heard no one, and there is nothing to show that the assured had or that he uttered any word or exclamation. He was presently found dead where he fell, and the evidence tends to show that one of the shots was fired with the weapon so near his body as to discolor his clothing with the burning powder. The shots could have proceeded only from the open side of the shed next to the railway track, and it was

lighted with two lamps as stated. The hour and the night was one in which honest men are not likely to be abroad with firearms. The time, place, and circumstances were suited to criminal purposes. It seems impossible for persons of reasonable intelligence to be deceived, in the presence of these pregnant facts, pointing unmistakably to only one conclusion. If it were possible to conclude that the first shot was fired accidentally, what are we to think in respect to that question, when it was instantly followed by two other shots, evidently aimed at vital portions of the body of the insured, and which took effect, inflicting fatal wounds? How many shots are we to believe were accidentally thus fired in rapid succession upon and into vital parts of the body of the insured, and under circumstances so favorable for assassination, at a time when firearms would be mainly in requisition or use for criminal purposes? It is contended, however, that there is no evidence that the assassin, at the time he inflicted the wounds, intended to inflict them on the body of the insured (that is to say, that there is no evidence to show that he knew, at the time he inflicted them, that he was inflicting them upon the body of Butero, the insured); and that, in the absence of such proof, the killing must be regarded as accidental and covered by the provisions of the policy. The case of *Utter v. Insurance Co.*, 65 Mich. 545 (32 N. W. 812, 8 Am. St. Rep. 913), is confidently relied on. In that case the provision of the policy was that the insurance 'should not be held to extend . . . to any case of death or personal injury unless the claimant under this policy shall establish, by direct and positive proof, that said death or personal injury was caused by external violence and accidental means and was not the result of design, either on the part of the insured or of any other person.' In that case the testimony was conflicting as to the circumstances of the killing; that of the plaintiff tending to show that the officer knew the insured and demanded his surrender as a deserter and shot him in self-defense, while that of the defendant tended to show that the shooting was reckless, and that the officer did not know the deceased, nor that he had shot him, until after the killing. It was held that the case should have been submitted to the jury, and that the design mentioned in the policy must be considered as a design to kill the insured; and if such design did not exist when he fired the shot, or if he did not know that the man he was

shooting at was the insured, then the plaintiff might recover on the policy. The present case is clearly distinguishable. Here there is evidence sufficient to show that the assassin intended to shoot Butero, the insured, and that when shooting he knew that he was shooting him and intended to kill him. It is true that no witness has testified to this effect in so many words, but this is the just and proper result of the facts and circumstances given in evidence and in respect to which there is no conflict or dispute. It cannot be expected that the assassin would expressly declare his recognition of his victim either immediately before or at the time of firing repeated fatal shots in and upon his body. All this is ordinarily to be left to inference, from a variety of facts and circumstances proved before the jury. Here the assassin went to the place, at the late hour of 11 o'clock at night, when a violent storm was prevailing, where Butero worked with his companion, approaching him from behind, when there were two lights burning near him. He did not direct his fire against Dominique but at once selected his victim and sent a bullet through his head, from which he fell dead, and he followed it by two other shots, evidently aimed with murderous intent, inflicting wounds either of which would have been fatal, and at a time when the evidence tends to show that he stood near enough to his victim to quite touch him with his extended hand. Had the first shot been fired through accident and not intentionally, it is not reasonable to suppose it would have been followed at once by others. Is it not a just and reasonable conclusion that the assassin recognized, and had no doubt of the identity of, his victim and followed the first shot by two others to certainly execute his deadly purpose? There is no evidence, fact, or circumstance tending to show, or even suggest, that the death of Butero, the insured, was accidental, within the meaning of the policy. The facts admit, we think, of but one conclusion. 'Res ipsa loquitur.' We think that the evidence was sufficient to show with reasonable certainty that Butero was murdered, and that his murderer knew his victim when he fired the fatal shot, and that he fired it with intent to kill him. The court erred, in our judgment, in refusing to set aside the verdict and grant a new trial.

So here I think the facts admit of but one conclusion. See, also, *Orr v. Travelers' Co.*, 120 Ala. 647 (24 South.

997); *Matson v. Travelers' Co.,* 93 Me. 469 (45 Atl. 518, 74 Am. St. Rep. 368); *Travelers' Ins. Co. v. Wyness,* 107 Ga. 584 (34 S. E. 113); *American Co. v. Carson* (Ky.), 30 S. W. 879. In this connection the court gave the following instruction:

In answer to your written request for advice touching the last two shots fired, you are instructed that you may consider with what intent the burglar fired the second and third shots as bearing on the question of his intent in firing the first shot; but, if you find from the evidence that the first shot was fired accidentally, then it makes no difference with what intent the second and third shots were fired; and if you are unable to determine, from a preponderance of all the evidence introduced bearing upon that question, whether the first shot was fired accidentally or intentionally, then you should find that it was fired by accident.

This, it seems to me, is entirely erroneous and prejudicial, and the effect of it was to take away from the jury all consideration of the firing of the second and third shots in so far as they bore upon the intent of the burglar. Assuming that the jury started out with the presumption that the shots were accidental, they, under this instruction, would have been justified, indeed, it would seem to have been their duty, to disregard the second and third shots. The instruction, to my mind, presents an anachronism if not a solecism.

The court also instructed:

(7) The burglar in this case may have intended to commit larceny, and may even intended to fire his pistol at the time the shot took effect without intending to injure the deceased, and, unless it appears affirmatively by a fair preponderance of the evidence that the burglar intentionally and did thereby intend at the time to inflict an injury upon the said Carmody, then the defendant has failed to sustain this ground of defense. Or if you find that the pistol went off accidentally, or as the result of a struggle between the

burglar and Mr. Carmody without regard to which one was holding it, the defense that the injury was intentionally inflicted is not made out. But if you find the burglar intended to hit and injure Mr. Carmody when he fired, or if you find from all the evidence that the discharge of the pistol was not the result of a struggle, then this defense has been made out and you should so find by your verdict.  '

This instruction, to my mind, had no support in the testimony. It was not fired as the result of a struggle, in which Carmody may have himself discharged it, nor was there any testimony tending to show that fact. The instruction invited the jury into a field of surmise, conjecture, and speculation for which there was no warrant in the testimony.

Moreover, I especially dissent from the argument made in the fifth division of the opinion. Counsel for appellee makes no such point; and, to my mind, the fact that the company inserted this third section in article 9 of its constitution clearly negatives the thought that it in any way intended to modify the other provision as to accidents resulting in death. In one case it assumed liability for certain accidents, resulting in injury only, and specifically and expressly contracted against liability for death resulting in any such manner.

II. With the general rule as to burden of proof of an exception contained in a policy of insurance, as announced by the majority, I have no quarrel, but it should be noted that in the cases first cited, or the majority of them, as in *Jones v. Accident Co.*, 92 Iowa, 652, there was no such clause in the policy as the defendant is here relying on.

I shall not enter into a long discussion of the troublesome questions of *prima facie* cases, presumptions, burden of the evidence, and burden of the proof. These terms have perplexed courts and text-writers from time immemorial, and it may be said that there are all kinds of presumptions and that the burden of the evidence is something entirely different from the burden of proof. These matters are fully

discussed in Chamberlain on Evidence, vol. 2, sections 930 to 1231, inclusive, and of course it is impractical to set out even a small part of that discussion. The matter is also considered by Wigmore, in his Treatise on Evidence, vol. 4, sections 2490-2494. Giving, to the presumption of accident, all the force to which it is entitled, it is not such as to create a conflict in the testimony if the known facts, as disclosed by the testimony, overcomes the presumption. Such presumption applies when and only when there is no evidence showing the circumstances and manner in which the injuries were inflicted. In other words, the legal inference or presumption must yield to well-established facts, and, when the facts are thus shown, the presumption no longer stands as affirmative evidence. I shall cite but a few authorities in support of this view in addition to the Wisconsin case already referred to. In several cases heretofore before this court, where the presumption of accident arose, we held, upon facts no stronger than are here presented, that this presumption did not stand as affirmative proof, making each case one for a jury, no matter what the testimony for the defense. Indeed, in each of these we held in effect that the presumption alone was not enough to carry the case to a jury, where the defense introduced affirmative testimony which met the presumption. I refer to the following: *Inghram v. National Union,* 103 Iowa, 395; *Beverly v. Supreme Tent,* 115 Iowa, 524; *Gavin v. Des Moines Co.,* 149 Iowa, 152; *Carnes v. Association,* 106 Iowa, 281; *Connell v. Traveling Men's Ass'n,* 139 Iowa, 444. If, as said in the latter case, "the facts and circumstances proved (by defendant) must be such as to exclude any other reasonable hypothesis than that it resulted from suicide" (homicide); I think those facts and circumstances are here present and that no other reasonable hypothesis than murder arises from this record. A presumption may stand as affirmative proof in some cases, and a *prima facie* case always calls for testimony from the other side, but the presumption of accident in insurance cases should not be allowed to overcome

such a clear case as is made for the defendant in the record before us. See, as supporting these views, *Agen v. Life Co.,* 105 Wis. 217 (80 N. W. 1020, 76 Am. St. Rep. 905); *W. O. W. v. Hruby,* 73 Neb. 5 (96 N. W. 998); Wigmore on Evidence, sec. 2493; *Peters v. Lohr,* 24 S. D. 605 (124 N. W. 853); Elliott on Evidence, secs. 91, 92, 93; *Burk v. Walsh,* 118 Iowa, 397.

Prof. Thayer, in his work entitled Preliminary Treatise on Evidence, 575 and 576, discusses this question very thoroughly, and there is also a learned discussion of the matter in 3 Harv. Law Review, pages 148, 151, 156, 166. We have adopted Judge Thayer's rule in *State v. Thiele,* 119 Iowa, 659. See, also, *Clemens v. Royal Neighbor,* 14 N. D. 116 (103 N. W. 402, 8 Ann. Cas. 1111); *Stevens v. Continental Co.,* 12 N. D. 463 (97 N. W. 862); *Kornfeld v. Supreme Lodge,* 72 Mo. App. 604; *Mutual Life Co. v. Hayward* (Tex. Civ. App.), 27 S. W. 36; *Supreme Lodge v. Fletcher,* 78 Miss. 377 (28 South. 872, 29 South. 523); *Hardinger v. Brotherhood,* 72 Neb. 860 (103 N. W. 74), reversing 101 N. W. 983.

But I promised myself not to go deeply into this perplexing problem; and to meet this promise I shall not take the time to cite other cases. The trial court erred, in my opinion, in giving the instructions to which I have referred and in not setting aside the verdict of the jury. As said in the beginning, I regret this conclusion, but I cannot, in justice to my convictions, join in an opinion affirming the judgment.

LADD, J., joins in the above dissent.