BUTERO, Respondent, vs. TRAVELERS' ACCIDENT INSURANCE COMPANY, Appellant.

*May 25 — June 11, 1897.*

*Accident insurance: "Intentional injuries:" Murder: Evidence.*

1. Under an accident insurance policy exempting the insurer from liability for "intentional injuries inflicted by the insured or any other person," there can be no recovery if the injury was intentional as to the person inflicting it, although accidental as to the insured in that he did not anticipate or expect it. *Button v. Am. Mut. Acc. Asso.* 92 Wis. 83, distinguished.

2. To defeat a recovery under such a policy it is only necessary that the evidence of intentional killing preponderate against the presumption of accident.

3. In an action to recover under such a policy, the evidence — showing, among other things, that the insured was a coal-heaver in the employ of a railroad company; that he was killed about 11 o'clock on a dark, stormy night while at work with one companion in a shed lighted by two lamps; that his death was caused by a pistol bullet in the brain; that the first shot was followed by two others each of which inflicted a mortal wound; that the shots could have proceeded only from the open side of the shed; and that when one of the shots was fired the weapon was so near his body as to discolor his clothing with the powder,— is *held* to establish with reasonable certainty that the insured was murdered, and that the murderer knew his victim and fired with intent to kill him.

APPEAL from a judgment of the circuit court for Washburn county: A. J. VINJE, Circuit Judge. *Reversed.*

This was an action brought on a certificate or policy of insurance in the defendant company, issued to Joseph Butero, the plaintiff's husband, June 4, 1895, in the sum of $1,000, insuring him against loss of time for injuries, not exceeding twenty-six weeks, or, if death should result from said injuries alone within ninety days, it promised to pay his wife the sum of $1,000. It was averred that he received personal injuries which caused his death on the 18th of September, 1895, and that all the conditions of the policy had been per-

formed on the part of the insured.    On the back of the cer-
tificate or policy are indorsed the following conditions: "This
insurance does not cover accident or death resulting wholly
or partly, directly or indirectly, from  .  .  .  intentional
injuries inflicted by the insured or any other person."    The
defense was that the insured was intentionally murdered or
killed, and met his death by intentional violence, inflicted
upon him by some person or persons to the defendant un-
known.

The evidence was, in brief, that the insured, who was a
coal heaver, worked on the Omaha railroad, at Spooner,
Wisconsin.    On the evening of September 18, 1895, he was
in his usual health, and he went to work in the coal shed
about 6 o'clock with a companion, Nels Dominique, hoisting
buckets of coal into proper position for coaling the engines.
They used a hoisting machine worked by cranks, and stood
with their backs towards the track upon which the shed
opened.    They worked there together from 6 o'clock until
between 10 and 11 o'clock.    It was a very dark night, and
it was thundering, lightning, and raining.    Dominique tes-
tified that he heard three shots fired; that he could not tell
which way they came from, because it was thundering so;
that he was standing on the left of Butero, and they were
just hauling up some coal; that when he heard the shot he
ran away, over to the depot about a block distant; that
Butero fell when the first shot was fired; that he saw him
fall, and then ran away; that he did not see anybody else
around there; that they were raising the bucket just as he
heard the first shot fired; that Butero had his hand on
the crank, and when the first shot came he let it go and fell;
that he (Dominique) did not have a pistol that night, and
did not shoot Butero himself; that they had two small lan-
terns, one of them on the right and one on the left of the
hoist, to see to work with.    It was admitted by the defend-
ant that shots were heard about 11 o'clock on the night in

question by W. E. Clinny, and that he immediately repaired to the coal shed in question where Butero was at work, and there found his dead body lying, with wounds appearing to have been made by a shot, and that he gave notice to the officers of the town, when his body was removed to the engine house in the city hall.

Dr. Barker, a physician and surgeon, testified that he examined the body the next day, when an inquest was held. There were three bullet wounds in the body. One entered a little back of and above the left ear, and probably passed clear through the brain to the opposite plate. He found two bullets lodged back of the right shoulder. One of them evidently passed through from the front, and the other from down below the fixed ribs. Either of the wounds was sufficient to cause death. In his opinion he had been recently wounded or injured by external violence, and his death was caused by either the bullet that passed through his head, or the one that entered below the ribs and passed up through his body to the back of his shoulder. One of the bullets entered near the right shoulder, about six inches from the peak of the shoulder, a little down on the breast. This bullet was taken out in the fleshy part, above the arm pit. The other entered below the fixed ribs on the left side; it was taken out about two inches below and back of the first one, in the fold of the flesh under the back side of the arm pit. The bullets were of the same size,— 38 calibre. He did not take the bullet out of the head. He saw him before his clothes had been removed. The clothes on the right shoulder near the bullet wound were burned on the outside of the frock, and some of the under garments were burned. In his judgment it was by reason of the discharge of the powder that caused the bullet wound, the weapon from which the bullet was fired being so close to the garments or body. There was no burning at the other wounds. He did not see any powder in the clothing. Proofs of loss were produced.

At the close of the testimony the defendant moved the court to direct a verdict for the defendant, which was denied. The court instructed the jury that the burden was on the defendant to satisfy them to a reasonable certainty, and by a preponderance of the evidence, that the insured met his death through intentional violence, inflicted upon him by some person or persons unknown; that the presumption of murder does not arise from the mere fact of external marks of violence upon the body of the deceased, as testified to, but "you must be satisfied from all the evidence, in order to find for the defendant: First, that the insured met his death through bodily injuries inflicted at the hands of some person or persons unknown; second, that at the time such person or persons inflicted such injuries he or they intended to so inflict them upon the body of the said Joseph Butero,— that is, that he or they knew, at the time he or they inflicted such injuries, that he or they inflicted them upon the body of the said Joseph Butero; and if you are satisfied from all the evidence that the person or persons inflicting such bodily injuries knew that he or they were inflicting them upon the body of the said Butero, and intended to so inflict them, then you will find for the defendant, otherwise for the plaintiff." There was a verdict for the plaintiff for $1,018.23. The defendant moved for a new trial, which was denied, and the plaintiff had judgment on the verdict, from which the defendant appealed.

*H. W. Chynoweth*, for the appellant.

*L. H. Mead*, for the respondent.

PINNEY, J. The contract upon which the action is founded is that the insurance provided by it "does not cover accident or death resulting wholly or partly, directly or indirectly, from . . . intentional injuries, inflicted by the insured or any other person." In view of the facts in evidence and about which there is really no dispute, the question is

whether the legal presumption invoked by the plaintiff, that the injuries the deceased received were accidental or unintentional, is not wholly repelled or overborne by the evidence. The presumption in question properly applies where there is no evidence to show the circumstances and manner in which the injuries were inflicted. The defendant is not liable if the injuries which caused the death of the insured were intentionally inflicted by himself or any other person. While this is a defense, and the burden of proof is ordinarily upon the defendant, yet, if it appears upon plaintiff's evidence, or upon the entire case, that such injuries were intentionally inflicted, the legal presumption is overthrown. The defense may be established by facts and circumstances, and the inferences properly to be drawn from them, sufficient to satisfy the jury of the truth of the defense with reasonable certainty. It is beyond question or dispute that the insured came to his death by external and violent means. The legal presumption is that his death was not caused by his own suicidal act. The evidence clearly shows that the external and violent means of his death proceeded from some person unknown. The inquiry is as to the question whether the shooting that caused his death was accidental or intentional and with the design of effecting his death; and this question is to be determined from the facts proved, the manner of his death, and all the attending circumstances. If the killing was accidental as to the insured in that he anticipated or expected no injury, but was intentional as to his assassin, then, according to the plain language of the provision of the policy, there can be no recovery. *Travellers' Ins. Co. v. McConkey*, 127 U. S. 661–667; *Mallory v. Travelers' Ins. Co.* 47 N. Y. 52. The case of *Button v. Am. Mut. Acc. Asso.* 92 Wis. 83, was upon a provision materially differing from the one in question, and this case is, therefore, not in point. It is necessary only that the evidence of intentional killing preponderate against the presumption of

accident. *Cronkhite v. Travelers' Ins. Co.* 75 Wis. 119; *Johns v. N. W. Mut. R. Asso.* 90 Wis. 335; *Bachmeyer v. Mut. R. F. L. Asso.* 87 Wis. 337, 338.

The plaintiff's counsel relies upon *Hutchcraft's Ex'r v. Travelers' Ins. Co.* 87 Ky. 300, in which it was held that one assassinated comes to his death by *accidental* means; but in that case there was not, as there is in this, a provision to the effect that the policy of insurance did "not cover accident or death resulting wholly or partly, directly or indirectly, from . . . intentional injuries inflicted by the insured or any other person," and it is not in point. Nor is *American Acc. Co. v. Carson* (Ky.), 36 S. W. Rep. 169, which did not contain the same or a similar provision. The same is true of *Insurance Co. v. Bennett*, 90 Tenn. 256.

The killing was clearly the result of intelligent human agency. Was it accidental or intentional? The assured went, at 6 o'clock in the afternoon, from his supper table, to his employment as a coal heaver in the coal shed, where he was to spend the night with his companion in hoisting coal. The night was a very dark one. It thundered and lightened and rained, particularly at the time he received the fatal shots. They worked continuously until about 11 o'clock, with their backs towards the railway track upon which the coal shed opened, with two lighted lamps near them, and with the upright hoist between them, operated by cranks, one working on either side. When they had partly raised a bucket of coal, and, so far as it appears, when they were utterly unaware of the presence of any human being, they were startled by a pistol shot, which sent a bullet crashing through the brain of the insured, and he fell dead where he had stood; and two other shots, either of which would have proved fatal, were fired in rapid succession into vital parts of his body. His companion, Dominique, instantly fled and ran about a block to the station. He had seen no one about there during the evening, and had heard no one, and there

is nothing to show that the assured had, or that he uttered any word or exclamation. He was presently found dead where he fell, and the evidence tends to show that one of the shots was fired with the weapon so near his body as to discolor his clothing with the burning powder. The shots could have proceeded only from the open side of the shed next to the railway track, and it was lighted with two lamps as stated. The hour and the night was one in which honest men are not likely to be abroad with firearms. The time, place, and circumstances were suited to criminal purposes. It seems impossible for persons of reasonable intelligence to be deceived, in the presence of these pregnant facts pointing unmistakably to only one conclusion. If it were possible to conclude that the first shot was fired accidentally, what are we to think in respect to that question, when it was instantly followed by two other shots, evidently aimed at vital portions of the body of the insured, and which took effect, inflicting fatal wounds? How many shots are we to believe were *accidentally* thus fired in rapid succession upon and into vital parts of the body of the insured, and under circumstances so favorable for assassination, at a time when firearms would be mainly in requisition or use for criminal purposes?

It is contended, however, that there is no evidence that the assassin, at the time he inflicted the wounds, intended to inflict them on the body of the insured,— that is to say, that there is no evidence to show that *he knew*, at the time he inflicted them, that he was inflicting them upon the body of Butero, the insured; and that, in the absence of such proof, the killing must be regarded as accidental, and covered by the provisions of the policy. The case of *Utter v. Travelers' Ins. Co.* 65 Mich. 545, is confidently relied on. In that case the provision of the policy was that the insurance "should not be held to extend . . . to any case of death or personal injury, unless the claimant under this pol-

icy shall establish, by direct and positive proof, that said death or personal injury was caused by external violence and *accidental* means, and was not the result of *design*, either on the part of the insured or of any other person." In that case the testimony was conflicting as to the circumstances of the killing; that of the plaintiff tending to show that the officer knew the insured, and demanded his surrender as a deserter, and shot him in self-defense, while that of the defendant tended to show that the shooting was reckless, and that the officer did not know the deceased, nor that he had shot him, until after the killing. It was held that the case should have been submitted to the jury, and that the design mentioned in the policy must be considered as a design to kill the insured, and, if such design did not exist when he fired the shot, or if he did not know that the man he was shooting at was the insured, then the plaintiff might recover on the policy.

The present case is clearly distinguishable. Here there is evidence sufficient to show that the assassin intended to shoot Butero, the insured, and that when shooting he knew that he was shooting him, and intended to kill him. It is true that no witness has testified to this effect in so many words, but this is the just and proper result of the facts and circumstances given in evidence and in respect to which there is no conflict or dispute. It cannot be expected that the assassin would expressly declare his recognition of his victim, either immediately before or at the time of firing repeated fatal shots in and upon his body. All this is ordinarily to be left to inference, from a variety of facts and circumstances proved before the jury. Here the assassin went to the place, at the late hour of 11 o'clock at night, when a violent storm was prevailing, where Butero worked with his companion, approaching him from behind, when there were two lights burning near him. He did not direct his fire against Dominique, but at once selected his vic-

tim, and sent a bullet through his head from which he fell dead, and he followed it by two other shots, evidently aimed with murderous intent, inflicting wounds either of which would have been fatal, and at a time when the evidence tends to show that he stood near enough to his victim to quite touch him with his extended hand. Had the first shot been fired through accident, and not intentionally, it is not reasonable to suppose it would have been followed at once by others. Is it not a just and reasonable conclusion that the assassin recognized, and had no doubt of the identity of, his victim, and followed the first shot by two others to certainly execute his deadly purpose? There is no evidence, fact, or circumstance tending to show, or even suggest, that the death of Butero, the insured, was accidental, within the meaning of the policy. The facts admit, we think, of but one conclusion. *Res ipsa loquitur.*

We think that the evidence was sufficient to show with reasonable certainty that Butero was murdered, and that his murderer knew his victim when he fired the fatal shot, and that he fired it with intent to kill him. The court erred, in our judgment, in refusing to set aside the verdict and grant a new trial.

*By the Court.*—The judgment of the circuit court is reversed, and the cause remanded for a new trial.