# MRS. LILLIE A. FREEZE v. THE CONTINENTAL CASUALTY CO.

Western Section. July 1, 1927.

No petition for Certiorari was filed.

1. **Appeal and error. Refusal of instruction must affirmatively appear on the records before a party can urge error on appeal.**
   Where the record did not affirmatively show that instructions were refused, held that the party could not urge the refusal as error on appeal.

2. **Appeal and error. Where there is legal doubt as to the conclusions to be drawn from the evidence, there is a question for the jury.**
   If there is any legal doubt as to the conclusion to be drawn from the evidence upon the issue to be tried, the case must go to the jury.

3. **Evidence. A witness may testify to an intent or state of mind when it is a point at issue of the trial.**
   In an action on an insurance policy where the issue was whether the deceased was intentionally shot, held that it was not error to permit the party who shot deceased to testify as to his intent at the time of the shooting.

4. **Insurance. Where company denies all liability suit may be brought before the expiration of the time limit as provided in the Acts of 1901.**
   Where the insurance company denies all liability the insured is not required to wait sixty days before suit, as provided in the Act of 1901 (Shannon's Code, 3369 A 141,142) but may sue at once.

5. **Insurance.** Exceptions to liability in insurance policy are strictly construed against the company.

The preponderance of the proof rests upon the insurance company to establish the fact that death or injury has resulted from the excepted causes.

6. **Insurance.** Provisions excluding liability in cases of intentionally inflicted injury held not to apply where one is killed by mistake.

Provisions of accident policies excluding or limiting liability in case of injuries intentionally inflicted upon the insured are generally held inapplicable where the insured is injured or killed by one who mistakes him for another person.

7. **Insurance. Evidence.** Evidence held sufficient to make a case for the jury as to whether deceased was killed accidentally or intentionally.

In an action on an insurance policy where it was shown that the deceased was killed by a negro who had been aroused by the barking of his dogs and shot in the dark in the general direction from whence the noise came, killing deceased, held that a question was made for the jury as to whether deceased was killed accidentally or intentionally.

Appeal from Chancery Court, Shelby County; Hon. M. C. Ketchum, Chancellor.

Affirmed.

J. H. Malone and Sam Taubenblatt, of Memphis for appellee.

L. M. Smith and Winchester & Knapp, of Memphis, for appellant.

OWEN, J. The defendant, an accident insurance company, has appealed from a judgment rendered against it in the chancery court of Shelby county in the sum of $2,000 principal and $75 in-interest, which judgment was rendered the 6th day of December, 1926.

The complainant is the widow of Thomas A. Freeze. Thomas A. Freeze was killed from two shots fired by Stuart Gaston, a colored man, on January 17, 1926. Freeze lingered from the night he was shot until January 21, a little more than three days.

The defendant denied liability by reason of a clause in the insurance policy which had been properly issued upon the life of Thomas A. Freeze, his wife, the complainant, being the beneficiary, which clause is as follows: "Provided, that if the insured, came to his death by the happening of an external, violent and purely accidental event, solely and independently of all other causes, and not from the intentional act of the insured or any other person."

The proofs of death had been properly filled out. Mrs. Freeze, in answer to Question 11 on the proof of death, viz.: "How did the accident occur?" answered: "Accident: Was shot by a negro who heard his dogs barking and thought someone was coming into his house."

Stuart Gaston in his affidavit, which is entitled "eye witness," made the following answers to the following questions:

"Q. Where were you at the time? A. In the back door of my home.

"Q. 5. What was deceased doing when injured? A. Coming toward me in the rear of my house.

"Q. 6. How far were you from him? A. About twenty feet.

"Q. 7. How did the accident happen? A. He was coming towards me at 11:00 p. m. I called to him twice without an answer and then I fired."

Upon the receipt of these affidavits which accompained the policy, the defendant returned the policy and denied any liability, calling the attention of Mrs. Freeze to the second paragraph of Part II of the policy, the company stating to Mrs. Freeze through its chief adjuster in a letter dated March 10, 1926, when the policy sued on was returned, that "You will observe that under Item 3 is specified that the policy does not cover any loss if the injury causing it results from the intentional act of the assured, or any other person. For this reason, among others, the case is not one which comes within the provisions of the policy."

Soon after receiving this policy the complainant filed her bill. The defendant answered denying any liability, alleging that Freeze was intentionally killed by Stuart Gaston. The cause was tried before the Chancellor and a jury. One issue was submitted to the jury, as follows: "Did the defendant Thomas A. Freeze come to his death by the happening of an external, violent and purely accidental event solely and independently of all other causes and not from the intentional act of the insured Thomas A. Freeze, or any other person."

The jury answered the issue in the affirmative, answering "yes." The court entered a decree upon the verdict of the jury. A motion for new trial was seasonably made, which was overruled and an appeal prayed and granted, and the same was perfected. The defendant has assigned nine errors:

The first and second assignments complain of the action of the court in not granting the defendant's motion for peremptory instructions.

The fourth, that the court erred in holding that the proofs of loss furnished by the beneficiary was sufficient in law to amount to a legal and proper proof of loss.

The third assignment complains of error in the court permitting the witness Stuart Gaston to answer that he did not shoot Thomas A. Freeze with the intention of killing him.

The sixth, seventh and eighth assignments complain of the court's action in refusing certain special requests submitted by the defendant.

The ninth assignment is, that the court erred in overruling the defendant's motion for a new trial. This assignment is overruled because it is too general and too indefinite.

As to the assignments in regard to the three special requests offered by the defendant, and which were refused by the court, and as to the testimony of Stuart Gaston, none of these assignments comply with the rule of this court, being subsection 2 to Rule 11, as found on page 815 of Vol. 151 of Tennessee Reports. We are not cited to any of the pages of the transcript. However, we have read the charge of the court, and at the conclusion of the court's charge to the jury as found on page 85 of the transcript, he following appears: "At the conclusion of the charge to the jury and before the jury retired, the defendant requested the court to charge the following propositions, and the court then gave the jury the following special instructions submitted by the defendant: (Here copy the special instructions given by the court on behalf of the defendant.)"

Following the order to the clerk to copy the special instructions, is the following: "The defendant also requested the court at that time to give the following instructions:" Then follows the defendant's instructions 1, 2 and 4. This is nothing in the transcript to show that they were declined. Immediately following request No. 4 as set out in the transcript is the following: "At the conclusion of the charge of the court, and before the jury retired, the complainant prayed the court to give the following request:" Then is set out the special request of the complainant, with the following appearing in the bill of exceptions, on page 87: "The court refused to give said special request, to which the complainant then and there excepted, which exception is noted accordingly."

So, it does not affirmatively appear that defendant's special requests were refused, and furthermore it does affirmatively appear that the court gave some of the defendant's special requests, which the clerk was instructed to copy, and immediately following this instruction to the clerk appears the three special requests, assigned, as having been refused and as error.

There is no error in the general charge of the court. It is very fair to the defendant. These assignments in regard to the special requests are overruled.

The main question to be decided, and which is conceded by learned counsel for appellant is whether or not the act of Stuart Gaston in shooting Thomas Freeze was intentional or unintentional. This case was ably argued at the bar and we have been greatly assisted with splendid briefs as to the facts and the law, submitted by counsel for both parties.

The learned Chancellor in charging the jury submitted the theories of the contestants plainly and understandingly, in the following part of his charge: "It is the theory and contention of the defendant, insurance company, that Freeze came to his death by means of pistol shot wounds intentionally inflicted by one Stuart

Gaston. In support of this theory it is insisted that Gaston was at home in bed; that he was awakened by his grandmother in the middle of the night, and told that there was somebody in the back yard; that he got up and got his pistol and went to the back door of his house; that the dogs were barking; that he saw some person or object in the yard; that he called to the intruder and receiving no response, he intentionally shot twice, both shots taking effect in the body of Freeze, and from the accuracy of his aim it is argued that he must have seen Freeze.

"If you find in favor of this theory, then I charge you that the shooting of Freeze, under such circumstances would have been the intentional act of Gaston, although he may not have known that it was Freeze; and if you find in favor of this contention your answer to the issue submitted will be 'No.'

"On the other hand it is the theory and contention of complainant that Freeze came to his death by means of pistol shot wounds unintentionally inflicted by Gaston; their insistence is that the night was very dark; that it was raining or had been raining, so that Gaston could not see Freeze, that the dogs were barking so that Freeze did not hear Gaston call him, or that Gaston did not hear Freeze answer; that Gaston shot at random in the dark, and without seeing Freeze, and that the actual shooting of Freeze was unintentional on his part; and, if you find in accordance with this theory I charge you that the shooting of Freeze, under such circumstances, was the unintentional act of Gaston, and you will therefore answer the issue submitted to you 'Yes.'

"The question of the intent on the part of Gaston with which he inflicted the injuries upon the said Freeze is a pivotal question in the case; and this intent is to be gathered from all of the facts and circumstances proved in the case, and all the facts and circumstances surrounding the killing at the time."

The deceased was shot about 11:30 o'clock at night. Just why he was at the home of Stuart Gaston and in Gaston's back yard is not explained. The night was dark; it was raining. Stuart Gaston was asleep, and was aroused by his grandmother. It appears she is a very old colored woman and did not testify in this case. All the testimony produced was introduced by the complainant.

When Gaston awoke he heard his dogs barking in the back yard— four in number. He got up and went to a bureau, pulled out the drawer and took from it a rather old 38 caliber pistol. He did not turn on any light. He went to his back door and called out "Who is there—who is there?" Receiving no response he shot twice toward the place where the dogs were barking. After shooting he returned to his room, lighted a lantern, went out and found the insured bending over, unable to speak. Gaston exclaimed, "Mister,

why didn't you say something? I would not have shot you for anything in the world!'' Freeze made no answer. It appears that Freeze was shot through the windpipe and this kept him from talking. He was also shot through the right lung, opposite his heart, and that is the wound that produced death. Gaston did not know Freeze; had never seen him before, but upon realizing that he had shot a white man he rushed to the nearest telephone, which was quite a distance, and had a message sent for an ambulance. The ambulance came, but could not get up to Gaston's house, and Gaston, with the aid of some other parties, carried the insured some distance to where the ambulance was, helped to place Mr. Freeze in it, told the driver of the ambulance when he reached the hospital to ''telephone the law to come down here and get me.'' He testified that officers did come and get him; that he stayed in jail for a number of days, was interviewed by the attorney-general and sheriff and was later released. On cross-examination this witness testified as follows:

''Q. Who did you say was present—what other persons? A. when?

''Q. When he was shot? A. My grandmother. She was the one that discovered the noise before I did. She called me to see who it was. I went to the door and asked 'who is it, who is it.' twice.

''Q. You say you could not see anybody? A. No, I could not see anybody. It was dark. I could not see who it was.

''Q. Did you have any light? A. No, I did not have no light at all.

''Q. You say it was dark and raining? A. Yes, sir.

''Q. How many dogs were there on the premises at that time? A. I guess about four.

''Q. Four dogs? A. Yes, sir.

''Q. Were they barking? A. Yes, sir.

''Q. They were after this man? A. Yes, sir.

''Q. Was there any sheds back of the house—any chicken houses or barn? A. Sure.

''Q. Any fence? A. No fence except the hog lot fence.

''Q. No fence except the hog lot fence? A. Sure.

''Q. You say he was coming towards you—you know north and south? A. Sure.

''Q. Which way was he coming? A. He must have been coming back this way.

''Q. He was between this hog lot and your house—the house you was in? A. The house sets in front of the barn. The barn is at the back, and he was back in the back.

''Q. And he was back in the back? A. Yes, sir.

"Q. And dogs were barking at him? A. Yes, sir.

"Juror: (Interrupting) About how far from the house was that? A. I could not exactly tell—it wasn't so far.

"Juror: Did you see him when you shot him? A. No, 1 could not see him, it was dark. It had been raining. I could not see out there. I could not tell who was out there.

"Juror: What was it you told him? A. I asked: 'Who is it' when I went to the door. I said 'who is it, who is it.' Nobody said anything.

"Juror: What did he say when you told him you would not shoot him for anything? A. He did not say anything at all.

"Judge Malone: I am going to ask you a question along that line—you say you got that light, did you get your light after you shot? A. After I shot—why sure, I did, and goes out there to see what is was.

"Q. Yes, sir? A. Sure.

"Q. And how was he—lying down, or standing up or what? A. Kind o' bent over."

A juror then ask the witness:

"Q. How did you know which way to shoot? A. I shot at the way the dogs were barking."

"Juror: About how far was it? A. I could not tell exactly.

"Juror: How far was it from where you fired? A. I could not tell.

"Juror: Was there any light out there at all? A. No light at all."

It further appears, as to Gaston's affidavit to the proof of death, that he did not write out the answers, and he was giving more of an opinion. On cross-examination the witness Gaston was asked:

"Q. Why did you shoot? A. Well, there didn't anybody say anything. I just shot to be shooting, I could not tell what it was at that time of the night."

If there is any material evidence to support the verdict this court will not reverse. "The fact that there may be evidence tending to overthrow the verdict, or contrary to it, is not sufficient to warrant a reversal upon the facts. If there is any material evidence to support the verdict, this court will not disturb it, except for errors of law prejudicial to the defendant." International Corp. v. Wood, 8 C. A. (Higgins), 10 on p. 20, Judge Hall delivered the opinion and cited in support thereof Walton v. Berchell, 121 Tenn., 723; Machinery Co. v. Hargrove, 111 Tenn., 476; Railroad v. Norgan, 123 Tenn., 1.

If there is any legal doubt as to the conclusion to be drawn from the evidence upon the issue to be tried, the case must go to the jury. Hines v. Partridge, 144 Tenn., 219, on p. 232.

"In considering the defendant's motion for a directed verdict, that view of the evidence most favorable to the plaintiff's case must be taken by the court, and if there is any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied. Nashville v. Resse, 138 Tenn., 471, 197 S. W., 492, L. R. A.; 1918B, 349." Hines v. Partridge, 144 Tenn., 219 on page 232.

We are of opinion, from all the facts and circumstances in the instant case, that there is material evidence to support the finding of the jury. The proof shows that the witness was asleep. He was suddenly aroused by his grandmother. He heard the dogs barking. He got his pistol in the dark, went to his back door, called out twice, "who is there?" He didn't see any objects, so he testified; he could not tell what it was at that time of night. It was dark and rainy. Whether Freeze failed to hear the call from Gaston on account of the dogs' barking, or whether Gaston didn't hear Freeze's answer on account of the barking of the dogs we do not know; and not getting a reply, and the dogs continuing to bark, Gaston said "I just shot to be shooting." His whole manner immediately following the shooting, and after he realized that he had shot Freeze, shows that it was unintentional and an accident. He exclaimed "Mister, why didn't you say something—I would not have shot you for anything in the world." He went out in the rain and ran half dressed quite a distance to the nearest telephone to summon first aid, after he discovered that Freeze was shot. The assignments of error, there being no material evidence to sustain the verdict, are overruled. It was not improper for the court to submit this issue to the jury.

On the question of the admissibility of Gaston's statement that he did not shoot with the intention of killing the deceased, or any other person, the defendant had already brought this out in a question "Why did you shoot?" and the answer was "Well, there didn't anybody say anything, I just shot to be shooting. I couldn't tell who it was at that time of night." There was no objection to Gaston's exclaiming, immediately upon discovering that he had shot Freeze: "Mister, why didn't you say something, I would not have shot you for anything in the world."

The question of the propriety of allowing a witness to testify as to the state of his own mind, where that was the point at issue came before our Supreme Court in 1879 where it was carefully considered in an opinion by Judge Cooper who reviewed the cases.

That was a case of malicious prosecution and it was ruled that the defendant was entitled to testify as to his belief of guilt of the plaintiff when he commenced the prosecution, and that he instituted the prosecution without malice. The court said:

"In an action for malicious prosecution of the plaintiff for perjury, the defendant was asked whether at the time he made the

complaint against the plaintiff he believed him guilty of the charge, the trial court excluded the evidence and the Supreme Court reversed the judgment for this error. Another point made below was that the matter sworn to was immaterial. The defendant was also asked whether, at the time he made the complainant, he believed the evidence given by the plaintiff was material. The trial court excluded the testimony, and such exclusion was also held to be erroneous. 'Both of these questions,' says the court, 'tended directly to repel the imputation of malice, and perhaps to some extent the want of probable cause. If answered in the affirmative, and reliance was placed upon the testimony by the jury, they would tend very much to exculpate the defendant; or, at all events, to mitigate the damages. How much weight the jury would give to such testimony was a question exclusively for them.' McKown v. Hunter, 30 N. Y., 625. The same high court has decided a number of cases involving the right of a party to depose to an intent or state of mind which seems fairly to establish the general principle that where the motive of the witness in performing a particular act or making a particular declaration becomes a material issue in a cause, or reflects an important light upon such issue, he may himself be sworn in regard to it, notwithstanding the difficulty of furnishing contradictory evidence, and notwithstanding the diminished credit to which his testimony may be entitled as coming from the mouth of an interested witness.'' Seymour v. Wilson, 4 Kerman, 567; Griffin v. Marquardt, 21 N. Y., 121; Forbes v. Waller, 25 N. Y., 430.

''The same rule has been applied in a criminal case; Kerrains v. People, 60 N. Y., 221. The Supreme Court of Nebraska, in a case like the present, in which the law touching the defendant's belief is laid down precisely as in our case, held that the defendant was entitled to testify in regard to his belief of guilt of the plaintiff when he commenced the prosecution against him, and that he instituted the prosecution without malice. Turner v. O'Brien, 5 Neb., 542. No authority has been adduced in conflict with these rulings. The court erred in excluding the testimony under consideration.'' Greer v. Whitfield, 4 Lea, p. 85.

While sitting on the Court of Chancery Appeals, Judge Neil said:

''It has been held that a party may testify as to what his intent was at the time the act relied on as constituting a dedication was performed.'' Mayor, etc. v. Cain, 44 S. W., 471, on p. 475, 1st column.

In 22 Corpus Juris, pages 610, 611 and 612, section 704, numerous cases are to be found in which a witness is permitted to testify as to his own mental state at a particular time, and many instances are given and among those that a witness may testify as to his in-

tent or intention at a given time, and on pages 611 and 612, note 78 cites about 100 cases from nearly every State of the Union in support of the text.

At the end of the note the following appears:

"(a)   The reason is that when the intention, a state of mind, is to be determined as an issue in a case the actor or doer knows more about the processes of his own mind than does anyone else. And so long as his secret intention is not so weighted down and drowned by his acts, as to mislead other persons to their injury and thereby estop him, he may testify to his secret intention when called as a witness." 127 S. W., 86, 138 A. S. R., 567.

This assignment of error is overruled.

On the question of the proofs not being properly submitted, there was a straight denial of any liability. Where the insurance company denies all liability, the insured is not required to wait sixty days before suit, as provided in the Act of 1901 (chaps. 3369a, 141, 142), but may sue at once. Thompson v. Life & Accident Co., 128 Tenn., 526. Insurance Co. v. Hancock, 106 Tenn., 513, 516.

"In an action on a life insurance policy plaintiff is not estopped from claiming that the death of the insured was caused otherwise than by suicide, by the statement and opinions contained in the proof of the death, that the cause of death was mental aberration, where the statements were based on hearsay." Home Benefit, etc. v. Sargent, 142 U. S., 699, 701, 35 L. Ed., 1160, 1165.

This brings us to the last proposition, and the one that is really controlling in this case, and that is the construction of the clause of the policy in regard to the intention of the party who did the shooting. The defendant practically contends that if Stuart Gaston intentionally pulled the trigger of the pistol which killed Freeze, then it is not liable. Counsel for complainant insists that the insurance company must not only show that Stuart Gaston intentionally pulled the trigger and shot, but must also show that he intended to shoot Freeze. The identical clause or provision in the policy whereby the insurance company claims nonliability has been construed by a number of courts of last resort in this country and some courts have construed a similar clause, but we have no decision from the Supreme Court of Tennessee construing a similar clause. The courts of last resort are divided on the question of liability. In construing the exceptions to liability in insurance policies, they are construed with great strictness against the company. Connecticut Fire Ins. Co. v. Jcary, 60 Neb., 338, 51 L. R. A., 698; Union Accident Ins. Co. v. Willis, 44 Okla., 578, L. R. A., 1915D; Ency. of Ev., Vol. 7, p. 549; Ins. Co. v. Dobbins, 6 Cates, 239; Ins. Co. v. Galbraith, 7 Cates, 482; Kavanaugh v. Ins. Co., 9 Cates, 56; Kane v. Fraternity, 5 Thomp., 247; Mills v. Ins. Co., 9 Thomp., 363.

The preponderance of the proof rests upon the insurance company to establish the fact that death or injury has resulted from the excepted causes. Ins. Co. v. Bennett, 90 Tenn., 255; Home Benefit v. Sargent, 142 U. S., 699; Union Accident Ins. Co. v. Willis, 44 Okla., 578, L. R. A., 1915D; Olson v. Southern Ins. Co. (Iowa), 208 N. W., page 213.

In the case of General Accident Ins. Co. v. Laura Hymes, Oklahoma Supreme Court, decided December 9, 1919, and reported in 8. A. L. R., at page 318, it was held that a provision contained in an accident insurance policy with exceptions from operation of the policy "injury intentionally inflicted upon the insured by any other person" contemplates injuries intended against the insured and not injuries intended against another, and such exception will not relieve the insurer from liability for injury to the insured inflicted by any other person whether the other person intended to injure someone other than the insured, mistook the insured for the person to be injured and intentionally inflicted upon him the bodily injury while the insured was not aware of the intent to injure him and had done nothing to bring about the injury. In the Oklahoma case the insured was shot. The party doing the shooting was one Drew. Drew undertook to shoot a man by the name of Nave, and when he discovered that the insured had been shot he exclaimed "Oh, Lord, did I shoot you Charley, I didn't know that was you I shot!" In the annotations following the Oklahoma case from which we have just quoted, we find the following notes, at page 322 of Vol. 8, A. L. R.:

"Provisions of accident policies excluding or limiting liability in case of injuries intentionally inflicted upon the insured are generally held inapplicable where the insured is injured or killed by one who mistakes him for another person. Newsome v. Travelers Ins. Co. (1915), 143 Ga., 785, 85 S. E., 1035; Travelers Protective Asso. v. Fawcett (1914), 56 Ind. App., 111, 104 N. E., 991; Hutchcraft v. Travelers Ins. Co. (1888), 87 Ky., 300, 12 Am. St. Rep., 484, 8 S. W., 570. . . .

"And in Newsome v. Travelers Ins. Co. (Ga.), supra, a provision of an accidental policy excepting injuries 'intentionally inflicted upon the insured by any other person' was held to contemplate only injuries intended against the insured, and not to relieve the insurer from liability for an injury to the insured by another who mistook him for the one intended to be injured, it appearing that the insured was unaware of the intent to injure him and had done nothing to bring about the injury.

"And in Travelers Protective Asso. v. Fawcett (1914), 56 Ind. App., 111, 104 N. E., 991, where the insured, a bank cashier, while in a group of four men in front of the vault in the bank, was shot

by one who was attempting to rob the bank, the evidence was held
to support a finding that there was no specific intent to injure the
insured, and it was held that the insurer was not relieved ·from
liability by a provision of the policy excluding liability on account
of injuries intentionally inflicted on the insured by any other per-
son.   The court ·said :  'The evidence shows without dispute that
Hoal (the robber) ˙discharged ˉseveral shots from revolvers into
the group of four men huddled together in front of the vault in
the bank.   There is a general presumption that a person intends
the usual and ordinary consequences of his act.   Appellant, relying˙
upon this presumption, asserts that the usual and ordinary con-
sequences of such an act would be to kill or injure some one or
more of them, and that, as there is no evidence whatsoever tending
to overcome such presumption, it must prevail and be sufficient to
establish the fact that Thomas Hoal intentionally killed the ˏassured.
If the question involved were one affecting the rights of Thomas
Hoal either in a civil or criminal action, the presumption stated
would obtain against him in all its strictness.   In such a case if it
appeared that the injury inflicted was the result of an act which
was reasonably calculated to produce injury to some one of a num-
ber of persons, a general intention to injure some person will be
presumed.   Such presumption includes all persons who were liable
to be harmed by such áct and therefore includes the person who
actually receives the injury.   In such a case it is presumed as
against the party inflicting the injury that he intended to injure
the person who was actually harmed, regardless of whether he had
any actual specific intention to injure such person rather than
another, and notwithstanding that he really may have intended
his act to harm someone else.   In this·case the rights of the person
who inflicted the injury are not involved.   The question arises
under a contract by which it was stipulated that the association
should not be liable on account of injuries intentionally inflicted
on the assured by any other person.   'Intentional injuries' inflicted
on the assured by some other person, within the meaning of this
contract, refer to injuries which the other persons actually directed
against the insured and intended to inflict upon him.   The parties
contracted with reference to the actual intention of the person in-
flicting the injury rather than such an intention as the law pre-
sumes against a wrongdoer.   In cases where rights of parties
claiming under such a contract are involved, and where it becomes
necessary to prove an actual intent to˙ injure a particular person,
the presumption that a person intends the ordinary and usual con-
sequences of his act cannot be given so wide a scope as it is given
in cases which affect the rights of the party who causes an injury.
In such a case if an act is shown which would naturally and reason-

ably result in injury to some one of several persons, it may be presumed that the author of the act intended to injure someone, but it cannot be presumed as against anyone except the author of the act that he intended the injury for the particular person who received it.'

"In Hutchcraft v. Travelers' Ins. Co. (1888), 87 Ky., 300, 12 Am. St. Rep., 484, 8 S. W., 570, where the insured was waylaid and killed for the purpose of robbery, a provision of the policy that no claim should be made when death was caused 'by intentional injuries inflicted by the insured or any other person' was held applicable and to prevent a recovery, but the court said: 'We think, however, that said clause was intended to apply to such injuries by other persons as are intentionally directed against the insured, and not to such injuries as the injured may receive at the hands of third persons who are attempting to do mischief generally; or who are attempting to injure any particular individual, other than the insured, or class of individuals, or any kind of property, for in such cases it cannot be said that the injuring was intentionally aimed directly and individually at the insured.'

"The provision involved in Utter v. Travelers' Ins. Co. (1887), 65 Mich., 545, 8 Am. St. Rep., 913, 32 N. W., 812, is somewhat different from the usual clauses found in accident policies, it being as follows: 'This insurance shall not be held to extend to . . . death or personal injury unless the claimant . . . shall establish by direct and positive proof that the said death or personal injury . . . was not the result of design, either on the part of the insured or of any other person.' In this case the insured was shot by a sheriff, but, the evidence being conflicting as to whether he knew who the insured was when he shot, it was held that the case should have been submitted to the jury, that the 'design' mentioned in the provision was a design to kill the insured, and that if at the time the sheriff fired he did not know that he was shooting at the insured, a recovery was not barred by the provision quoted."

In line with the authorities herein cited, is the case of Mah-See v. North American Accident Ins. Co., California Supreme Court, decided February 16, 1923. Mah-See was the widow of Fong Wing, a Chinese, who was killed by a party who intended to kill some person other than Fong Wing. The Mah-See case is reported in 26 A. L. R., page 123, the California court approving the authorities that we have heretofore quoted in this brief. The annotator of A. L. R. refers to the annotations in the Mah-See case, supra, as given in 8 A. L. R., p. 322, which we have quoted.

In Cooper v. National Life Ins. Co., 212 Mo. page 266, decided in 1923, it appears that the insured was a negro at a colored dance

in St. Louis, and that there was an old grudge between a negro man named Barry, and a negro woman named Perkins, and a fight took place, Barry waving a pistol when the Perkins woman grabbed the insured and got behind him so that the first shot of Barry struck the insured who then wrenched himself from the woman's grasp and the next two shots from Barry's pistol struck the woman.

The question before the court was whether the first shot which hit the insured was an "intentional" act and the court held it was not. The first paragraph of the syllabus thus correctly summarizes the holding of the court:

"Within the meaning of an exemption clause in an accident insurance policy, exempting liability from injuries caused wholly or in part by the intentional act of any person other than the insured, an act does not consist alone of the power exerted but includes the immediate effect of the power exerted, so where one person shoots another, the act consists in not only the power exerted in discharging the leaden ball from the revolver, but includes the striking of such other person with the ball so discharged; therefore the power exerted may be intentional while the immediate effect of the power exerted may be unintentional; and it requires both the power exerted and its immediate effect to constitute the act, and though the power exerted may be intentional, yet the immediate effect thereof is unintentional then the act is an unintentional act."

In the case of Olson v. Southern Surety Co., 208 N. W. (Iowa), decided in 1926. Olson was beaten up during a drunken brawl, in a bootlegging joint. There was a lengthy opinion reviewing all the authorities and the unanimous conclusion reached by the court is thus expressed in the 12th and 15th paragraphs of the syllabus:

"(12) Under policy excepting injuries sustained from intentional act of another, the presumption (though not conclusive) is that the injuries, though inflicted by another, were not intentional.

"(15) To bring injury to insured within exception of injuries from intentional act of another, the intention must be to commit injury, as well as to do the act, and must be toward the insured."

In a Mississippi suit decided in 1926 upon a similar policy to the one in the instant case, the court thus summarizes the salient facts:

"That at the time of the homicide, and for several hours previous thereto, appellant (Will Walls) was drunk on whiskey; that two or three hours before the homicide, at another place than where the homicide occurred, he was drunk, staggering around, cursing and shooting off his pistol; that when he reached the scene of the homicide, he got out of the car in which he was traveling, staggered up against a fence, and leaned on it to keep from falling remaining

in that attitude until the shooting; that the witness smelled whiskey on him; that he was drunk; that he was staggering; that he was leaning against the fence for support; that he was cursing;. that he appeared not to know what he was doing; that he was crazy drunk and that in that condition he pulled his pistol and placed it against the breast of the insured, and without any provocation whatever fired the pistol causing the fatal wound. The trial court in ruling out this evidence necessarily held that it did not tend to establish that Will Walls, at the time he fired the fatal shot, was. incapable of comprehending the nature and quality of the act he was doing.'' Hutson v. Continental Casualty Co., 107 Miss., 520, p. 521.

Against these authorities appellant has cited a number of cases, some holding that murder of the insured has been held to be within the proviso excepting from the risk injuries or death resulting from intentional injuries inflicted by insured or any other person, and among which are the cases of Johnson v. Travelers Insurance Co., 39 S. W., 932; Jarragin v. Travelers Protective Association, 133 Fed., 892. In the latter case the insured was killed by a mob while under arrest. In these cases where the party is wilfully murdered there was, of course, an intention on the part of the killer to take the life of the insured.

In Orr v. Travelers Insurance Co., 120 Ala., 647, the court held:

''Where insured, being unable to gain admittance to his wife's room through the door, went into the yard near a window of the room, whereupon a man who was in the room fired through the window, the bullet killing insured, the intent was held sufficient to substantiate the provision against liability for intentional injures.''

In the case of Butero v. Travelers' Acc. Ins. Co., 96 Wis., 536, cited above: ''Where it appeared that insured was shot by a person unknown, the evidence showing that the murderer knew his victim when he fired, and that he fired with intent to kill him,'' the intent was held sufficient to substantiate the provision against liability for intentional injuries.

It is further stated in the case of Butero v. Travelers' Acc. Ins. Co., 96 Wis., 536: ''Where the insured is shot several times the presumption arises of an intent to kill him.''

Continental Casualty Co. v. Cunningham, 188 Ala., 159, and Life Ins. Co. v. Coughlin, 72 Colo., 440 holds in favor of the insurance company, and in each instance a clause similar to the one now under consideration was up for construction. In the Alabama case the insured was a policeman. A man named McGuffin was fleeing from arrest. He was shooting at any and every one who interfered with his purpose to get away, the court did not approve the case of Utter v. Travelers Insurance Co., 65 Mich., 545, it said

that the principal announced in the Utter case could not be applied in the Alabama case.

We are of opinion that the weight of authority is with the complainant, and we held that it was proper to submit the question of the intention of shooting Freeze to the jury. The jury found that Freeze came to his death by purely accidental means, and not from the intentional act of the insured or any one person, and under the entire record we are of opinion that this was a proper answer to make to the issue submitted, and that the weight of authority supports complainant.

It results that all of the assignments of error are overruled and disallowed and the judgment of the lower court is affirmed. Complainant will recover of the defendant and surety on appeal bond the amount of the judgment rendered in the lower court, with interest thereon, and all the cost of the cause for which execution will issue.

Heiskell and Senter, JJ., concur.