Price, Respondent, vs. Inter-State Business Men's Accident Association of Des Moines, Iowa, Appellant.

*June 1—October 11, 1932.*

For the appellant there were briefs by *Grady, Farnsworth & Walker* of Portage, and oral argument by *Dorothy Walker* and *Daniel H. Grady*.

*J. T. Dithmar* of Elroy, for the respondent.

The following opinion was filed June 20, 1932:

FAIRCHILD, J. In this action the respondent, because of the death of her husband, seeks a recovery under an accident insurance policy insuring him against accident and which contains the stipulation that "the association will not be liable for the payment of any sum whatever . . . (4) if the injury be intentionally produced by any person, whether sane or insane."

The insured's death April 14, 1930, resulted from gunshot wounds inflicted April 13th. If it appears from the evidence that these wounds were inflicted by some one who intended to injure the insured, then under the terms of the policy there is no liability on the part of appellant and respondent's case must be dismissed.

Price was an attorney at law engaged in practicing his profession at Mauston, Juneau county, Wisconsin. At the times hereinafter mentioned he was the district attorney of that county. In November, 1928, he notified a federal pro-

hibition officer of the existence of a still on what is styled as the Evans farm near Mauston. An investigation of the premises followed. This was conducted without the presence or knowledge of the sheriff of the county, one Lyall Wright, whom Price had said could not be trusted. At the time of the raid a large still and a considerable quantity of alcohol were discovered. Men by the names of de Palma, Azzarella, and Al Diamond were arrested. After the raid, which occurred in the afternoon, Wright told a federal officer that Price was "a double-crosser," that the still was not supposed to be raided, that Price was getting paid to let it run. That evening about ten o'clock Price armed himself with a revolver and gave one to Mr. Allaby, who, with Mrs. Price and Frances Liest, was to accompany him on an automobile ride. As they proceeded out of town they noticed a car following them, and when they drove into the city of Kilbourn and stopped at a curb the other car came to a stop, Wright got out of it, approached Price, and said: "You God damn son-of-a-bitch, you will talk to me now or you will never talk to any one." Price refused to talk with Wright until Wright had given his revolver to Frances Liest. There was a conversation between Price and Wright in which Wright acted unfriendly, bitter, and showed hatred. From then on Wright and Price did not speak to each other. Following the raid there was a proceeding before Governor Zimmerman to remove Wright as sheriff of Juneau county, which resulted in his removal. Wright was later indicted and convicted in the United States district court on the charge of conspiracy to violate the prohibition act, as were others who were arrested at the time of the raid. After Wright was arrested by the federal authorities and before his trial, Price was indicted for conspiracy to violate the prohibition laws, charged with having conspired with Diamond, de Palma, Azzarella, Wright, and

others.  Wright, Diamond, de Palma, and Azzarella testified against Price, but Price was acquitted March 15, 1930. Wright, Diamond, de Palma, and Azzarella were sentenced on April 11, 1930, and a stay of execution granted to April 25, 1930.  Price was killed Sunday April 13, 1930.

On that day the deceased and Mrs. Price were alone a large part of the day, had dinner about four o'clock in the afternoon, played cards on the dining-room table, and about eight-thirty in the evening they went to the kitchen to get a lunch.  Mrs. Price turned on the lights in the kitchen and in the hallway leading to the basement.  Price started to go to the basement to get some milk and stood in the doorway leading into the basement hallway.  Beyond this hallway was a screen door leading into the yard.  This screen door was about five feet from the threshold of the kitchen door. As he stood, his back toward the screen, he was shot.  He fell forward; Mrs. Price, who was standing immediately in front of and near him, helped him to the dining-room where he was laid upon the floor.  Mrs. Price told the telephone operator of the shooting and called to neighbors.  Price was moved to his bedroom and in a few minutes taken to the Mauston hospital where he died about 12:30 a. m. April 14, 1930.

There were holes in the screen door made by buckshot, two of which entered Price's body; and buckshot were found in the frame of the door, the kitchen wall opposite the screen door, and one penetrated the wall into the bathroom.  In the rear of the Price home is a retaining wall thirty-seven feet from the rear end of the house.  Two hundred and fifty-four feet north of this wall is the Lemonweir river.  There was a spread of these shot of about fourteen inches.  Twelve bullet holes were found.  The shots entered the screen door three or four feet from the floor, but when they reached the opposite side of the kitchen wall they were

six feet from the floor. When standing in the doorway Price was plainly visible to any one standing in back of the house. The shades in the kitchen were not drawn; the west window was low enough so that a person on the outside could look in. After the shooting it was noted that the grass behind the stone wall had been trampled down.

Carl Schultz, a boy fifteen years of age who lived about one hundred and fifty yards northwest of Price and about seventy-five feet from the Lemonweir river, was near the river bank at the time and heard the gun fired. He did not see any one with a gun but noted that the report came from the vicinity of the Price home. He saw a boat going across the river, heard the squeaking oars, saw the wake of the boat in the water, and knew it was going fast as it crossed at a point just in back of the Price home. Next morning the boy saw the boat on the opposite side of the river about seventy-five yards from the point where it crossed. The boat had been detached from a stump farther up the river by breaking a lock. There is evidence that some time between securing the boat and the firing of the shot an injury was sustained by the murderer which was sufficient to cause some bleeding. Raymond Schultz testified that about two minutes after he heard the shot he noticed a person rowing a boat across the river. He saw the boat the next morning, and noticed blood spots in different places on the boat. A gunshot wad was found the morning after the shooting about eight or ten feet north of the steps of the Price home leading toward the river. Herman Lockner noticed the retaining wall in back of the house and the bullet holes in the casing of the door. He attempted to determine the course of these bullets from the retaining wall and found the aim slanted up from the retaining wall toward the house to the point where the bullets entered. He noticed some footprints in the burned-over grass between the Price home and

the river.  These footprints were far apart, indicating that they were made while running or jumping.  The next morning a gun was found in the water near a boat house just opposite the Price home.  This gun, a Winchester pump, held six shells, and when taken from the river one of the shells showed it had been discharged.  The numbers stamped on the stock and barrel had been filed off.  At the time it was taken from the river there were some stains on the stock of the gun near the trigger.

R. L. Fuller, first lieutenant of infantry, who had made a study of various types of firearms over a period of years, testified to tests made with a gun exactly of the same type as that found in the river, loaded with buckshot of the same kind, to determine the spread and carrying power of shot fired from such a gun.  From his experiments it appears that a shot fired from within seventy feet distance from where the shot took effect in the kitchen wall would be capable of resulting in the condition produced by the shot fired that Sunday night.

While the one who fired the shot has never been convicted of it and may never be sufficiently identified to warrant accusation, still the tangible circumstances surrounding this death are such that the only reasonable inference to be drawn therefrom is that the death of Price was the result of an intentional act.  Can there be any doubt that Price was killed by an act which was performed in the carrying out of an intent to produce that result?  The evidence of preparation for this crime is shown by the following acts: The obliteration of the identification marks on the gun, the taking of a boat from a distance, breaking it loose from its moorings under such difficulties that whoever did it suffered a wound as shown by the blood spots near the oar-lock on the boat and on the butt of the gun, and the lying in wait for the opportunity to carry out the formed intent as shown by

the trampled grass near the stone wall in the rear of the house. These acts of preparation were followed by the shooting of Price, and this in turn was followed by flight as shown by the footprints, the hurried rowing across the river, the abandoning of the stolen boat, and the attempted·concealment of the gun by throwing it in the water. These facts constitute evidence of an intentional act barring all question of accidental shooting and compel a conclusion that an intentional act caused the death of Price. We may leave out of consideration all the evidence relating to motive and desire for revenge, of which there is considerable, and there still remains to exclude the inference of accidental shooting the evidence of preparation for the crime, the shot fired not from the river nor the river bank, but from a place selected by the assassin as being best calculated to secure him an effective aim at his mark. There is also the evidence that the man who broke the lock used to fasten the boat injured himself; that he handled the gun and was in the boat as it crossed the river after the shot was fired.

This is but a brief summary of all the evidence. But the evidence is undisputed and unexplained and when reasonably interpreted does not sustain the finding of the trial court on the primal and controlling question. A finding reached by ignoring the evidence and giving weight to a fanciful possibility that some one might have accidentally discharged a gun causing Price's death cannot be approved. *Butero v. Travelers' Acc. Ins. Co.* 96 Wis. 536, 71 N. W. 811; 2 Wharton, Crim. Ev. (10th ed.) § 753.

The terms of a lawful contract of insurance fix the limits of the liability of the insurer and prescribe the conditions under which a beneficiary may realize upon a policy. *Lundberg v. Interstate Business Men's Acc. Asso.* 162 Wis. 474, 156 N. W. 482. The terms of the policy in this case expressly provide that the association is not to be liable for

the payment of any sum whatever if the injury sustained and causing the death of the insured is intentionally produced by any person. It is an insurance against accidental acts and the agreement is to pay for the result of such. The purpose of the contract to exclude injuries and their result from causes not accidental is obvious. The death of Price being due to an intentional act, judgment was erroneously granted respondent and must be reversed.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in favor of defendant dismissing plaintiff's complaint.

A motion for a rehearing was denied, with $25 costs, on October 11, 1932.