500

## MRS. RUBY V. DUKE v. PEOPLES PROTECTIVE LIFE INSURANCE CO. —392 S.W.(2d) 830.

Middle Section, at Nashville. December 4, 1964.

Certiorari Denied by Supreme Court April 5, 1965.

James P. Kelley, Nashville, for plaintiff in error.

Thomas H. Peebles, III, Nashville, for defendant in error.

SHRIVER, J.   Plaintiff below, appellant here, Ruby Duke, brought these two cases which were consolidated for the purpose of trial, to recover benefits under two insurance policies issued by defendant below, appellee here, Peoples Protective Life Insurance Company, upon the life of Ollie Duke, deceased, who was a son of Ruby Duke.

The cases were tried before Honorable Byrd Douglas, Judge of the Second Circuit Court of Davidson County, and a jury, and, at the conclusion of all the evidence he directed a verdict in favor of the defendant in both cases.

From this verdict and judgment the plaintiff appealed and has assigned the action of the trial Judge in directing a verdict in favor of defendant as error, insisting that there was material evidence to support a verdict for the plaintiff.

It was stipulated that the policies on which these two suits were based were in full force and effect at the time of the death of Ollie Duke and that claims were properly filed. It was further stipulated that certain sworn statements given in the office of the District Attorney General relative to the shooting and the death of Ollie Duke, might be read to the Court and jury and treated as evidence in the cause.

It is shown that one of the policies provides that no indemnity for death by accidental means shall be payable

if death results "(c) from injuries intentionally inflicted upon the insured by himself, or by any other person other than burglars and robbers."

The other policy provides in Section (1) thereof, that the Company will pay to the beneficiary a "death benefit" of the face value of the policy ($1,000.00) upon due proof of the death of the insured. Section (2) provides for an "accidental death benefit" in an amount equal to the aforesaid "death benefit", provided that the "accidental death benefit" shall not be payable and does not cover "death resulting from intentional injuries inflicted by another."

The defendant insurance company denied Mrs. Duke's claim for benefits under the terms of the first policy, (Exhibit 1) on the ground that the death of the insured was intentionally inflicted by another person who was not a burglar or robber.

Under the terms of the second policy (Exhibit 2) the company paid Mrs. Duke $1,000.00 but declined payment of the additional amount under Section (2) on the ground that the death of the insured resulted from intentional injuries inflicted by another.

The record shows that on November 13, 1960 at approximately eight o'clock P.M. the insured, Ollie Duke, who was a boy about seventeen years old, and a negro woman, Dorothy Jones, engaged in an argument outside Lovell's Pharmacy at 46th and Charlotte Avenues in Nashville. During the course of the argument Dorothy Jones attempted to strike the insured, first with her pocket book and then with her shoe, and, after an exchange of obscene language the Jones woman got in her automobile and drove away from the scene. As she was

leaving she stated, "You could be dead by tomorrow, I will be back in about ten minutes", or words to that effect.

After Dorothy Jones drove away Ollie Duke, along with two other young men, went inside the drug store and sat or stood at the soda fountain and, while standing there, after some eight or ten minutes, the Jones woman was seen returning.

She parked her car on the opposite side of the street and came in the drug store. As we consider the statements of Dorothy Jones and of the two or three eye witnesses, we find some discrepancy in the testimony as to just what was said by her when she returned and as to exactly what occurred.

In any event it appears that, after exchanging some words with Ollie Duke, she pulled a pistol from her pocket book and pointed it at him, whereupon, he ran behind a magazine counter and pulled out a knife. Dorothy Jones said that he threatened her with a knife and one of the other witnesses said that he had a knife which, after she had fired the pistol at him and missed, he threw at her but did not hit her. He pushed the magazine counter over against her and then ran out the door, and, as he did so, he threw his coat into her face, whereupon, she fired again and this time the bullet took effect striking Ollie Duke in the head resulting in his death.

The question with which we are concerned here is whether or not there is any material evidence from which a jury might, with reason, find that the death of Ollie Duke was not intentionally inflicted. It was the conclusion of the trial Judge that there was no material evidence upon which a jury could reach such conclusion and, therefore, he directed a verdict for the defendant.

504

Examining the statements of Dorothy Jones and some other witnesses which were put in evidence by stipulation of the parties we find the following which we deem to be material:

Dorothy Jones stated, among other things, that about seven or eight o'clock on the evening of November 13, 1960 she went to Lovell's drug store at 46th and Charlotte Avenues to make a purchase and when she came out of the store several white boys were standing in front of the building and one of them, Ollie Duke, made an obscene remark to her. She replied using similar obscene language which we do not think it necessary to repeat. She stated that the boy then started running around her car and kept hitting on it and pulling on the door and, when she tried to get in her car he pushed the door against her. She took off her shoe and undertook to strike him with it but failed and, after she had started the car, she said to him, "You could be dead by tomorrow". She stated that he kept hitting on the car and she said to him "O.K. I will be back in about ten minutes," whereupon, she drove away.

She further stated as follows: "I got part of the way home—to about 40th and Indiana, and I thought about the baby oil so I turned around and went back to the drug store to get it. I parked the car on the opposite side of the street from the drug store facing South. Then, when I started in the drug store, a girl came to the door of the drug store and then turned around and went back and when I came in this white boy who had make the remark to me before, jumped down off the stool and walked across the floor and behind some racks with some books on it and he had a knife in his hand and I started around and I said 'why don't you meddle with me like

you did a while ago' and he said 'what you want me to say, I will say it' and I said 'say what you said a while ago'. Then he walked by the rack and I walked by the rack and he came to the side and was holding the knife up and by that time he was standing behind the magazine rack and I said 'well if you are bad go ahead and say it'. Then he pushed the rack on me and I came from behind it and he had had the knife up and he threw it at me and I ducked and that is when I shot at him. I got the pistol out of my pocket book as I came around the rack.

Then he was at the door and I was not intending to shoot him, but thought I would scare him. He went on out the door and when I came out the door he threw his coat at me and that is when I shot him I guess. I don't really know how many times I shot—Well, I do remember I shot two times.''

Question by Mr. John Cole;—

Q. When did you put the gun in your purse?

A. It had been in there a pretty good while

Q. Then you carried the pistol to Hartsville with you today?

A. Yes sir, I did carry it with me.

Q. What is your estimate of what you would call a pretty good while?

A. Well the last time I used the pocket book before today I think it was last Sunday or Monday one.

Q. You did not change it from pocket book to pocket book when you went home?

A. I had not been anywhere to use it.

Q. Did you stay there until the police came?

A. Well, I guess they were already coming. Just after I shot I saw this boy laying there and then about that time the police came up.

Q. Were you in the car by yourself?

A. Yes sir, I was by myself.

Q. Why did you come back to the drug store?

A. I wanted to get some baby oil.''

Statements of Jones E. Travis and Anthony Victor Forte were read but shed no light on the question we are to determine here.

Marvin Nelson Rankhorn, who was present during the encounter between Ollie Duke and Dorothy Jones, and who was there when she returned stated, ''We didn't think anything about the threat that she had made and Ollie didn't either, we didn't take her to be serious.'' He stated that when she came back she walked to the side door and called to Ollie, ''I'm back; come on outside''. Ollie replied that he was not going outside. He stated that she pulled the gun out of her purse when she came in the door and was pointing the gun at Ollie. He said that Ollie moved around in front of the magazine rack and pushed the rack against the woman and she then fired at him but missed. He stated ''I then saw that Ollie had a knife in his hand and he threw the knife at her but missed and hit me. The woman then shot again and missed and the bullet went through the screen door. Ollie was trying to take his coat off as he was going out the door, he was running and she was right behind him. He was just outside and she was outside too and Ollie threw his coat at her and pushed her up against the wall

of the building. Ollie jumped back as if he was going to run and that is when she shot him.''

█ It is permissible for one who shot a person to testify as to his intent. Freeze v. Continental Casualty Co., 5 Tenn.App. 261. In the present case the intention of the assailant is the determinative question.

We think it significant that Dorothy Jones testified that she did not intend to shoot him but intended to frighten him using the words, ''Then he was at the door and I was not intending to shoot him, but thought I would scare him. He went out the door and when I came out the door he threw his coat at me and that is when I shot him I guess.''

It is also significant that she testified that the gun had been in her purse for some time and that she had made a trip to Hartsville on that day with the gun in her purse, which, if true, would negate the idea that she left the scene of the quarrel and went to her home to get the gun and then returned to shoot Ollie Duke, since it appears that she had the gun in her purse at the time of the quarrel.

She also testified; ''I got part of the way home—to about 40th and Indiana and I thought about the baby oil so I turned around and went back to the drug store to get it.''

Q. Why did you come back to the drug store?

A. I wanted to get some baby oil.

In Mutual Life Insurance Company v. McDonald, 25 Tenn. App. 50, 150 S. W. (2d) 715, it was said that, in considering defendant's motion for a directed verdict and in ascertaining whether there was any evidence to sup-

port a verdict for the plaintiff, plaintiff was to be given the benefit of all evidence adduced in his behalf, while all evidence in conflict therewith was to be discarded, and plaintiff was entitled to all legitimate inferences of fact favorable to him which might be reasonably drawn from the evidence tending to support the cause of action stated in the declaration.

Perhaps the strongest and clearest statement of this proposition contained in our reported cases is that in the case of Poole v. First National Bank of Smyrna, 29 Tenn. App. 327, 336, 196 S. W. (2d) 563, 567, wherein Judge Felts, with his accustomed clearness and succinctness, stated:

"The rule for determining a motion for a directed verdict has often been stated in numerous cases. It has been fashioned to preserve the constitutional right of trial by jury and to administer by common law separation of function by which the jury try the fact and the judge the law. It requires the trial judge, and the appellate court on review, to look to all the evidence, to take the strongest legitimate view of it in favor of the opponent of the motion, to allow all reasonable inferences from it in his favor, to discard all countervailing evidence; and if then there is any dispute as to any material determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence, the motion must be denied." Citing numerous cases.

When we apply this rule to the evidence hereinabove quoted can it be said that the minds of all reasonable men must agree, after discarding all the countervailing evidence and allowing all reasonable inferences in favor of

the plaintiff's position, that there is no doubt as to the conclusion to be drawn from the whole evidence.

While it must be conceded that a strong preponderence of the evidence would indicate that Dorothy Jones intended to shoot Ollie Duke, nevertheless, we are inclined to the view that there is material evidence in the record from which the jury could conclude that the woman went back to the drug store, not for the purpose of shooting Ollie Duke, but for the purpose of buying some baby oil, and, finding him there, renewed the argument and intended to frighten him by shooting in his direction and did not intend to kill him, but, in the excitement of the encounter when his coat was thrown in her face and she was pushed against the wall, she shot and killed him, but that it was not an intentional killing.

We are inclined to the view that the evidence makes a jury question and that it was error to direct a verdict for the defendant.

It results that the assignment of error is sustained and the causes are remanded for a new trial.

Remanded.

Humphreys and Chattin, JJ., concur.